**DONG SIK KWON, Petitioner,**

v.

**IMMIGRATION AND NATURALIZA-TION SERVICE, Respondent.**

No. 79–2850.

United States Court of Appeals, Fifth Circuit.

May 4, 1981.

**910**

Eugenio Cazorla, Dallas, Tex., for petitioner.

Eric Fisher, James P. Morris, Attys., George W. Masterton, Asst. Gen. Counsel, INS, Chief Govt. Reg. & Labor Section, U. S. Dept. of Justice, Washington, D. C., for respondent.

Before GODBOLD, Chief Judge, BROWN, AINSWORTH, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, THOMAS A. CLARK, and WILLIAMS, Circuit Judges.*

ALVIN B. RUBIN, Circuit Judge:

A native and national of Korea who had come to the United States for a temporary visit with a visitor's visa submitted an application for adjustment of status to the Immigration and Naturalization Service (INS). Dong Sik Kwon sought a change to permanent residence status as an investor. At the time Kwon submitted his application, no nonpreference applicants could be admitted because the numerical limitation for Korean nonpreference visas had been reached. However, the INS did not notify Kwon of this fact for two years. He contends that, had he known that no visa was available for a nonpreference immigrant, he would instead have applied for a visa as a preference immigrant, and sought adjustment of his status on the basis of a labor certification. Having since filed such an application, he seeks to have it accorded a priority date retroactive to the time when, had he received prompt advice from the INS, he could have done so. A panel of this court, considering itself bound by a prior panel decision, *Suh v. Immigration and Naturalization Service*, 592 F.2d 230 (5th Cir. 1979), remanded the case for a further hearing to determine whether Kwon had been prejudiced by the government's inaction. *Kwon v. Immigration and Naturalization Service*, 610 F.2d 353 (5th Cir. 1980). The court later granted a rehearing en banc, automatically vacating that decision. *Kwon v. Immigration and Naturalization Service*, 625 F.2d 1310 (5th Cir. 1980) (en banc). We now conclude that Kwon is not entitled to the relief he seeks and that the INS is not estopped to deny it to him. Therefore, we affirm the decision of the Board of Immigration Appeals.

### I.

The significant facts do not take on full meaning until they are portrayed against the pattern established by the statutes and the intricate scheme of the regulations. The administration and enforcement of the immigration laws are the divided responsibility of the Attorney General, the Secretary of State, the Secretary of Labor, the Secretary of Health and Human Services, the Secretary of Education, the International Communication Agency and the Con-

---

* Judge Coleman did not participate in the consideration or decision of this case.

gressional immigration committees. J. Wasserman, Immigration Law and Practice 11 (3d ed. 1979). The Attorney General is charged with the enforcement of the immigration laws, 8 U.S.C. § 1103, and he has delegated this responsibility to the INS.

An alien may seek admission to the United States temporarily as a nonimmigrant under conditions prescribed by the Attorney General. 8 U.S.C. § 1184. A visa may be issued to a nonimmigrant who has a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for either business or pleasure. *See* 8 U.S.C. § 1101(a)(15)(B). *See also* 8 C.F.R. 214.2(b) (1980), 22 C.F.R. 41.25 (1980). There is no quota for such visitors.

Congress has, however, prescribed an annual quota (now called a numerical limitation) limiting to 290,000 the number of aliens who may be admitted as immigrants for permanent residence. At the time Kwon applied, admissibility was limited to 170,000 immigrants from the Eastern Hemisphere and 120,000 from the Western Hemisphere. 8 U.S.C. § 1151(a).[1] Subject to statutory exceptions not here relevant, no person may receive any preference or priority because of race, sex, nationality, place of birth or place of residence, but the total number of visas made available to natives of any single foreign state may not exceed 20,000 in any fiscal year. 8 U.S.C. § 1152(a). Aliens who are subject to these numerical limitations are allotted available visas based on a series of preferences that are prescribed by statute for certain classes of immigrants. 8 U.S.C. § 1153(a)(1)–(8).[2] The first two preferences are for certain classes of relatives of United States citizens. The third includes members of the professions and persons of exceptional abili-

ty in the sciences and arts whose services are sought by an employer in the United States. The fourth and fifth preferences are for other classes of relatives. The sixth preference is for persons capable of performing specified skilled or unskilled labor, not of a temporary or seasonal nature, for which a shortage of employable and willing persons exists in the United States. To secure a visa under the sixth preference, the applicant must obtain a "labor certificate" from the Secretary of Labor. 8 U.S.C. § 1182(a)(14). If all of the available visas are not used by persons entitled to a preference, they are made available to other qualified immigrants "strictly in the chronological order in which they qualify." 8 U.S.C. § 1153(a)(8). Any immigrant who wishes to enter this country under any preference category, or as a nonpreference immigrant, must secure a labor certificate or be entitled to an exemption from that requirement.

All six preference classes take precedence over investor applicants. Therefore an applicant who, like Kwon, seeks investor status is accorded no preference. Investor status merely exempts the applicant from labor certification requirements. *See* 8 U.S.C. § 1182(a)(14); 8 C.F.R. § 212.8(b)(4) (1980). Investors need not obtain such a certification because an investor does not compete with American workers for jobs. In fact, the present regulations involving investors require that the applicant-investor provide at least one American citizen or permanent resident alien with a job.[3] 8 C.F.R. 212.8(b)(4) (1980). The regulations in force at the time Kwon applied as an investor required the alien to establish that he was seeking to enter the United States to engage in an agricultural or commercial enterprise in which at least $10,000 would

---

1. On October 5, 1978, a statute, Pub. L. No. 95–412, 92 Stat. 907, became effective that combines the numerical limitations for the Eastern and Western Hemisphere.

2. Within each preference class, visas are issued in chronological order according to the date on which the applicant files his application. That date is known as the priority date. 8 C.F.R. § 245.1(g)(2) (1980).

3. The regulations now in force require an investment in excess of $40,000 in addition to the requirement that the enterprise employ at least one United States citizen or lawful permanent alien. 8 C.F.R. § 212.8(b)(4) (1980); 22 C.F.R. 42.91(a)(14)(ii)(d) (1980).

be invested and that he had at least a year of experience or training qualifying him to engage in such an enterprise. 8 C.F.R. § 212.8(b)(4) (1976); 22 C.F.R. § 42.-91(a)(14)(ii)(d) (1976).

While the Attorney General is given final discretion to grant or refuse a visa, the Secretary of State has plenary control of the visa issuing process. 8 U.S.C. § 1104. *See also* 22 C.F.R. Subchapter E (1980). Pursuant to Department of State regulations, authorized by statute, visas are issued by United States Consuls.[4] The State Department's regulations provide for allocation of numbers for use in connection with the issuance of immigrant visas and adjustments of status on a quarterly basis within each fiscal year. 22 C.F.R. 42.60(a), (b) (1980). *See also* 8 U.S.C. § 1151(a). Under this system a visa number may be allocated to a person who does not in fact use it. If this happens, for whatever reason, the non-use of the visa must be reported to the Department so that another visa can be issued during the same fiscal year. Otherwise, that vacancy in the quota is irretrievably lost. 22 C.F.R. 42.60(c) (1980).

The status of an alien, admitted temporarily, who "was inspected and admitted or paroled into the United States may be adjusted ... to that of an alien lawfully admitted for permanent residence" by the Attorney General "in his discretion and under such regulations as he may prescribe." 8 U.S.C. § 1255. Such a change involves altering the status of an alien who is in the United States illegally or temporarily from that of visitor or illegal alien to that of lawful permanent resident. To qualify for a change of status four conditions must be met: the alien must apply for this adjustment by submitting a form I–485, must be eligible to receive an immigrant visa, must be admissible as a permanent resident and, according to the statute in effect when Mr. Kwon applied, "an immigrant visa [must be] immediately available to him at the time his application is approved." *Id.*[5]

Within the Department of Justice, such applications are handled by the INS pursuant to regulations adopted by the Attorney General in accordance with the statute. 8 U.S.C. § 1255(a); 8 C.F.R. Part 245 (1976) ("Adjustment of Status To That of Person Admitted For Permanent Residence."). The alien applies for such an adjustment by submitting Form I–485 to the INS district director having jurisdiction over his place of residence. 8 C.F.R. § 245.2(a)(1) (1976). The regulations provided that, before the application "may be considered properly filed, a visa must be immediately available." 8 C.F.R. § 245.2(a)(2) (1976).[6] However, an application for adjustment of status may be filed either simultaneously with a visa petition or without a visa petition. No visa petition is required, for example, if the applicant has a priority on an American consular waiting list, has already received approval of a visa petition, or is entitled to preference as the spouse or child of a beneficiary of a visa petition or as a refugee or in certain other circumstances. *See* Form I–485, Part 13.

The regulations in effect at the time Mr. Kwon submitted his Form I–485 provided, "If a visa petition is submitted simulta-

---

**4.** *See* 8 U.S.C. § 1101(a)(9); 22 C.F.R. § 42.120 (1980). *See also*, J. Wasserman, Immigration Law and Practice, Appendix C, List of Visa Issuing Posts, U. S. Department of State (3d ed. 1979).

**5.** The last word was changed to "filed" by a 1976 amendment. Pub. L. 94–571 § 6, October 20, 1976, effective January 1, 1977, 90 Stat. 2705. Whether this change has substantive effect, we do not now attempt to determine. Certain parts of the regulations have also been changed since Kwon applied. In the remainder of this opinion we consider only the effect of their text at the time of his application without intimating any opinion concerning whether, had he applied at a later time, the regulations then in effect would have altered the result.

**6.** The regulations also provided that no Section 1255 application shall be approved until the State Department has allocated an immigrant visa number. 8 C.F.R. § 245.2(a)(4) (1976). In practice, the consular officers and the INS report the use of an allocated number to the State Department. Each immigrant visa number, whether allocated as a result of a new visa petition or approval of a Section 1255 application, is charged against the numbers currently available for that particular year.

neously with the adjustment application, the adjustment application shall be retained and processed only if the petition is found to be in order for approval upon initial review by an immigration officer, is approved, and approval makes a visa immediately available." 8 C.F.R. § 245.2(a)(2) (1976).[7] The regulations also provided that an application for adjustment of status, whether or not submitted with a visa petition, should not be considered properly filed unless a visa was immediately available.[8] Significantly, the regulations also explicitly stated, "A nonpreference alien for whom a visa is not immediately available may not *file* an application for adjustment of status, but may seek to establish a nonpreference priority date through an application for an immigrant visa at a United States consular office." 8 C.F.R. § 245.2(a)(2) (1976) (emphasis supplied). *See also* 8 C.F.R. § 245.-2(a)(2) (1980) (identical provision retained in current regulations).

The regulations provided further that a visa would be considered immediately available if the numerical limitation for a particular preference category were not exhausted (*i.e.* if the State Department Bulletin showed that numbers for visa applicants in his preference category were current) or if the applicant had a "priority date" on the waiting list not more than ninety days later than a date shown in the Bulletin. 8 C.F.R. § 245.1(g)(1) (1976).[9]

Although the regulation specified that an adjustment application submitted simultaneously with a visa petition should be "retained and processed only if" a visa is immediately available, neither the statute nor the regulations stated what action, if any, the INS should take if it received a Form I–485 submitted without a visa petition at a time when no visa was available. No command for action was contained in the regulations other than the statement that applications should be retained only if a visa was available. The procedures to be followed were, instead, covered by Operations Instructions that the INS had issued to its personnel.

The instructions in effect in March 1976, stated that applications for adjustment of status were to be reviewed upon receipt. This review did not include a check for the availability of a visa. Each application

---

7. This regulation was amended in 1978 and now reads, "If a visa petition is submitted simultaneously with the adjustment application, the adjustment application shall be retained for processing only if approval of the petition *when reached for adjudication* would make a visa immediately available at the time of filing of the adjustment application. If such petition is subsequently approved, the date of filing the adjustment application shall be deemed the date on which the accompanying petition was filed." 8 C.F.R. § 245.2(a)(2) (1980). (Emphasis supplied)

The provision applies only to simultaneous submissions for the obvious reason that it contemplates that both applications will be submitted simultaneously in all cases except those in which the applicant already possesses a valid visa or is entitled to one of the few exclusions from that requirement.

8. An application for adjustment of status under section 245 of the Act as a nonpreference alien shall not be considered properly filed *unless the applicant establishes* that he is entitled to a priority date for allotment of a nonpreference visa number in accordance with § 245.1(g)(2) and *that a visa is immediately available* within the contemplation of § 245.1(g)(1). (Emphasis supplied.)

8 C.F.R. § 245.2(a)(2) (1976).
The regulations currently in force contain the same provision. 8 C.F.R. § 245.2(a)(2) (1980). The regulations do not explicitly differentiate between receipt of an application, that is, its delivery to the INS, and its "filing" or "proper filing."

9. The priority date of an applicant seeking a visa under one of the six preference classes was set at the date on which an approved petition was filed. The regulations contained multifarious criteria for determining the priority date of an application filed by an applicant seeking a nonpreference visa number. In the case of such an applicant, the priority date was set at the earliest of four dates: the priority date accorded the applicant by a consular office; the date on which the application for adjustment is "filed", provided the conditions of 29 C.F.R. § 60 are met; the date on which an approved third or sixth preference visa petition was filed; or the date an application for certification was accepted for processing by the Department of Labor, provided the certification applied for was issued. 8 C.F.R. § 245.1(g)(2) (1976).

went first to clerical personnel in the Records Administration and Information Section. An application submitted without fee or without signature was to be returned to the applicant by the personnel in this Section. Thereafter, the applications retained were to be routed to Travel Control.[10] Operations Instructions (O.I.) 245.2.

Applications sent to Travel Control were to be examined to determine whether a visa was available, the application was complete, and prima facie eligibility had been established. If Travel Control determined that an application had not been *properly filed* because of the unavailability of a visa, and this defect did not appear to be curable by further processing, the instruction provided that a notice of rejection was to be sent to the applicant informing him that a refund of his fee was being considered. O.I. 245.-2(a). Thus, it is apparent that the Operations Instructions allocated responsibility to Traffic Control for checking the availability of a visa and also drew a distinction between receipt of an application and its proper filing. Determination that an application was properly filed was made only by the Travel Control Section, some time after the application was initially received and preliminarily examined. We apply this scheme of statutes, regulations and operations instructions to the steps Kwon took to secure permanent resident status in this country.

## II.

Kwon entered the United States on September 5, 1975, with a visitor's visa issued for the professed purpose of making a pleasure trip. He was authorized to remain only until October 4, but he overstayed his visit without INS permission.[11] Early in 1976 he purchased two wig stores in Dallas, Texas. On March 31, 1976, he filed a Form I–485 seeking adjustment of his status from that of illegal alien to lawful permanent resident. He supported his application for status as a nonpreference immigrant by a request for a determination, that, as an investor (Form I–526), he was exempt from the labor certification requirements. Although Kwon did not possess a visa, neither the record nor his brief clearly indicates whether his submission of Forms I–485 and I–526 was intended to incorporate a simultaneous petition for a visa. As a practical matter such a distinction is rarely important. If a person does not possess a valid visa and is not entitled to any of the special exemptions, his I–485 constitutes a simultaneous submission of a visa petition. Here, however, the different procedures called for in the regulations require us to determine the exact nature of Kwon's application. Despite the confusion in the record and the briefs, we treat Kwon's application as the simultaneous submission of a visa petition and an application for adjustment of status because he did not possess a valid visa and was not entitled to any exemption.

Kwon's application for status adjustment was rejected by the District Director on January 26, 1978, on the grounds that he had withheld material facts when he applied for his original visa, and, in addition, his investment was insufficient to qualify him as an investor.[12] Although unavailability of visa numbers was not relied on by the District Director, it is a matter of record that no nonpreference visa numbers were available in 1976, when the application was filed or in 1978, when it was rejected, and none have been available for Korean nationals at any time since then because the

10. If the application contained information indicating that the applicant was under deportation proceedings, the application was to be sent to the Immigration Court.

11. This action placed Mr. Kwon in a class of illegal aliens who have overstayed their temporary visa time limitations. *See* 8 U.S.C. § 1251(a)(2). *See generally Matter of Palmieri*, 10 I&N Dec. 187 (B.I.A.1963).

12. The regulations then in force pertaining to nonpreference status, 8 C.F.R. § 218(b)(4) (1976), permitted an investor to be exempted from the labor certification requirement if he invested in excess of $10,000 in a commercial or agricultural enterprise. Excluding inventory, the District Director found that Kwon failed to meet that requirement. He also noted that Kwon's investment failed to expand the labor market.

Korean numerical limitation has been reached in each year by Koreans entitled to preference status.[13] Following this decision, Kwon was given permission to depart voluntarily before February 26, 1978; if he did not, deportation proceedings would be instituted.

When Kwon failed to depart voluntarily, deportation proceedings were begun. 8 U.S.C. § 1251(a). Although no administrative appeal from a denial of an application for adjustment of status is provided by the INS, the applicant may submit an application for *de novo* consideration at the deportation hearing. Kwon chose this course and, though conceding deportability, renewed his Section 1255 application as an investor. Electing again to proceed toward permanent residence as an investor, he did not seek classification as a sixth preference immigrant. He was represented by a lawyer and the wait for sixth preference numbers was only five months. A change in his course of action, however, would have required abandoning the investor application and would have forced him to obtain a labor certification.[14]

The immigration judge to whom the deportation hearing was referred concluded that Kwon did not qualify as an investor because he could show that he had invested only $2,000 in the wig business and was, in effect, merely displacing a wig salesman.

The immigration judge also noted that, because of the numerical limitation for Korea, a nonpreference visa had not been available at the time Kwon submitted his adjustment application or at any time thereafter and, therefore, a visa, as required, had never been available to Kwon.[15] The judge, however, did not rely explicitly on either of these conclusions. Instead, finding that Kwon was forced to subsist below the poverty level,[16] that he had been an illegal alien prior to the time he filed his application for adjustment of status, that he misstated his intent originally to enter the United States as a pleasure visitor, and that he had a preconceived intent to reside in this country permanently,[17] the immigration judge ruled that, even assuming that Kwon met the investor requirements, he was not entitled to a favorable exercise of discretion. *See Tuan v. Immigration and Naturalization Service*, 531 F.2d 1337 (5th Cir. 1976); *Soo Yuen v. Immigration and Naturalization Service*, 456 F.2d 1107 (9th Cir. 1972). In lieu of deportation, however, Kwon was again granted the privilege of departing voluntarily within ninety days. If he failed to depart voluntarily, he was to be deported.

Kwon appealed this deportation order and denial of his adjustment application to the Board of Immigration Appeals (BIA). The BIA, refusing to reach the merits of

13. In fact, nonpreference numbers have been unavailable worldwide since September 1978. *See* U.S. Department of State, Bureau of Consular Affairs, Visa bulletin No. 1, Vol. V; No. 12, Vol. IV; No. 99, Vol. III.

14. Investors and workers pursue divergent paths. An investor secures lawful permanent residence by providing jobs for American citizens, while one who attempts to secure a labor certification seeks to be an employee.

During the pendency of this proceeding, in September 1979, Kwon changed his course, sought a labor certification and obtained sixth preference status. He received a priority date for sixth preference status at that time. However, no visa number is available for him, based on the sixth preference priority date then accorded him, and, unless he obtains the retroactive priority he now seeks, he must be deported to Korea to await his turn. By protracting these proceedings, of course, he may continue to reside in the United States while he awaits the

date for his turn as a sixth preference applicant.

15. Regardless of Kwon's counsel's professed prior ignorance of the unavailability of visa numbers, the Immigration Judge's decision plainly put the parties on notice that no visas were "immediately available," as required by both the statute, 8 U.S.C. § 1255(a)(3), and the regulations, 8 C.F.R. § 245.2(a)(2) (1976).

16. Kwon's reported net income from his two wig stores, as found by the immigration judge, totaled less than $700 for his first eleven months of operation.

17. Supported by substantial evidence on the record, the judge found that Kwon came to the United States without a ticket for departure, soon thereafter sold his business and home in Korea and brought his wife and three children from Korea to the United States.

Kwon's investor application, chose a fourth alternative and dismissed the appeal solely on the ground that Kwon failed to meet one of the requirements of 8 U.S.C. § 1255, that a visa be immediately available, because nonpreference visas for natives of Korea had been unavailable at all times relevant to his application. Kwon was granted thirty days to depart voluntarily. He petitions for review of the BIA order.

■ The INS asks us to consider the facts found by the immigration judge at the deportation hearing when the ALJ reviewed *de novo* Kwon's adjustment of status application. The facts found by the immigration judge may, indeed, have been good reason for the BIA to order Kwon's deportation. The BIA did not, however, choose to act on that basis in the order we are now asked to review, and we are not permitted to consider reasons other than those it advanced. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *Real v. Simon,* 514 F.2d 738 (5th Cir. 1975); *SEC v. Chenery Corp. (Chenery I),* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). Kwon concedes that the lack of available visa numbers was a permissible basis for denying his adjustment application and ordering his deportation. However, he seeks a modification of the deportation order to accord his application for sixth preference status retroactive priority, "in the interest of justice."

### III.

The Supreme Court has left unanswered the question whether, in some circumstances, the government may be estopped from denying citizenship to an applicant by the affirmative misconduct of the government or its employees. *See Immigration and Naturalization Service v. Hibi,* 414 U.S. 5, 8, 9, 94 S.Ct. 19, 21, 38 L.Ed.2d 7, 10 (1973); *Montana v. Kennedy,* 366 U.S. 308, 314, 315, 81 S.Ct. 1336, 1340, 1341, 6 L.Ed.2d 313 (1961). In *Hibi* it observed that, as a general rule, neither laches nor neglect of duty by government officers is a defense to a suit to enforce the laws enacted by Congress. The government is not merely a private litigant dealing with another private party. 414 U.S. at 8, 94 S.Ct. at 21, 38 L.Ed.2d at 10. The INS is charged with administering an act that has limited the number of persons who may be admitted to the United States and prescribed the order in which applicants are eligible. In carrying out this function, it enforces the public policy established by Congress.

■ Applying these principles to the facts presented here, we conclude that mere failure by the INS to reject an application promptly upon its submission if visa numbers are not then available does not create an estoppel. Recognizing this, at oral argument, Kwon's counsel acknowledged that the facts did not give rise to an estoppel. Kwon also conceded that, because of the unavailability of current visas, he was not entitled to adjustment of status as a nonpreference immigrant.

He contends, however, that, had he been advised in 1976, when he sought investor status, that no nonpreference visas were available, he would instead have filed immediately for admission as a sixth preference applicant and would have sought a labor certificate to obtain the earliest possible priority date. He invokes the decision of a panel of this court in *Suh v. Immigration and Naturalization Service,* 592 F.2d 230 (5th Cir. 1979) and decisions of the Ninth Circuit Court of Appeals in *Santiago v. Immigration and Naturalization Service,* 526 F.2d 488, 491–92 (9th Cir. 1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), and in *Yoo v. Immigration and Naturalization Service,* 534 F.2d 1325, 1329 (9th Cir. 1976).

In *Santiago* and *Yoo* the Ninth Circuit applied *Immigration and Naturalization Service v. Hibi,* 414 U.S. 8, 94 S.Ct. 19, 38 L.Ed.2d 10 (1973), to the facts at issue to determine whether the Immigration agent's misconduct was "affirmative." Counsel has here conceded that the retention of Kwon's application is not the type of affirmative misconduct envisioned by the Supreme Court in *Hibi.* Therefore, neither case supports Kwon's contention.

Our panel in *Suh*, however, did not rely on estoppel. Instead it accorded relief to Suh "in the interest of justice" on the basis that the INS had violated its own "regulation" in retaining an application for adjustment of status when no visa numbers were available. The panel ordered the BIA to permit the petitioner "to apply for a sixth preference *visa* by filing Form I–140 and a labor certificate with the benefit of a [retroactive] priority date." *Suh v. Immigration and Naturalization Service*, 592 F.2d at 232–33. (Emphasis supplied.) Kwon seeks the same relief. Indeed, he states he is willing to depart from the United States voluntarily under the shield of such an order, for he could with that preference and priority date now apply to the United States Consul in Korea, and obtain a visa.

▉ We conclude that Kwon is not entitled to retroactive relief and that the retroactivity accorded Suh is not sanctioned by either the immigration statutes or the regulations. Although discretion is given to the Attorney General to admit applicants, he has no authority to act retroactively on an application. *Matter of Talanoa*, 13 I&N Dec. 161, 163–65 (BIA 1969) aff'd, 427 F.2d 1143 (9th Cir. 1970); *Matter of Palmieri*, 10 I&N Dec. 187, 188–89 (BIA 1963); *cf.* 8 U.S.C. § 1153(h) ("Retroactive readjustment of refugee status to that of alien lawfully admitted for permanent residence"). The statute also contains no authority under which the Department of State or the INS can grant a visa priority date retroactively, nor under which the Department of Labor can grant a labor certification retroactively.

We do not now decide whether equitable relief would be foreclosed if an applicant

were to establish that he was entitled to priority at the time of his application and that the INS erroneously deprived him of a classification to which he was then entitled. *See* note 22, *infra*. However, for an applicant to be granted a retroactive priority date *nunc pro tunc*, it would be essential that the facts warranting priority have existed at the time his application was originally submitted, in Kwon's case, on March 31, 1976. *See Matthies v. Railroad Retirement Board*, 341 F.2d 243, 246 (8th Cir. 1965). Kwon did not then have an employer, or potential employer, who could seek the issuance of a labor certification and approval of a sixth preference petition in his behalf. Therefore, the granting of a priority date *nunc pro tunc* on the basis of acceptance and approval of a labor certification application that was never previously filed would clearly be inappropriate.

While Suh's case was somewhat different factually, because the INS stipulated that Suh qualified as an investor, the panel acted under the misapprehension that the INS had violated the regulations in accepting an application at a time when a visa was not immediately obtainable. Counsel for Kwon concedes in his brief that the regulation was not violated in *Suh* because the regulation did not explicitly require the rejection of applications for which visas are not immediately available. He contends, however, that the applicable Operations Instruction required the INS to send notices of rejection to all applicants for whom visas were not immediately available [18] and that, therefore, the result reached by the *Suh* panel was correct. The INS states that it knew of the court's misunderstanding but failed nevertheless to apply for a rehearing.[19]

---

18. 245.2 *Processing* (a) *General.* Upon receipt the application shall be reviewed to determine whether it has been properly filed (signed by the applicant, correct fee submitted, and visa available), whether it is complete, and whether prima facie eligibility has been established. Applications submitted without fee or without signature should be returned to the applicant by R.A.&I. and shall not be routed to Travel Control. When Travel Control determines that an application has not been properly filed because a visa is not available and that

availability of a visa cannot be achieved by approval of a visa petition or issuance of a labor certification, the application shall not be returned to the applicant; instead he shall be sent an explanatory notice of rejection with such other advice as may be appropriate, and shall be informed that a refund of his fee is being considered... (Emphasis added.)

19. The *Suh* opinion indicates that the panel confused the nonpreference adjustment application with a "visa petition," since, in com-

The regulations in effect in March 1976, were not violated by any affirmative misconduct. At the worst, the INS did not detect what Kwon should have learned before submitting his I–485. The regulations did not direct it to give information to the applicant. Therefore, no violation of the *regulations* has been shown.

█ This leaves one final contention, that the INS failed to follow its Operations Instructions and a retroactive priority date should be assigned to Kwon to accord him justice. It may be doubted that the INS wrought an injustice upon Kwon in allowing him to come to the United States as a visitor and to continue to remain here with his family for four and one-half years after his visitor's visa had expired. Even if the intermediate failure of the INS, however, to tell him that no visa number was available was unjust, it does not follow that a federal court is endowed by the Constitution or the immigration laws with a nationwide warrant to correct whatever it senses to be an improper action by an immigration officer.

While the Operations Instructions then in effect required the Travel and Control Section to send Kwon a notice of rejection, the applicable *regulation* provided that an adjustment application "shall not be considered properly filed unless *the applicant* establishes that . . . a visa is immediately available. . . . " 8 C.F.R. § 245.2(a)(2) (1976) (emphasis supplied). While the regulations were not clear, they implied that the burden was on the applicant to prove that a nonpreference visa number was current when he applied.[20] The practice has been to place this burden on the applicant. Kaye, Adjustment of Status, 11th Annual Immigration and Naturalization Institute 209, 216 (1978). We are aware that, in practice, despite the issuance of monthly bulletins showing the availability of visa numbers, an applicant may find it difficult or impossible in fact to determine the availability of a visa number on a given day. However, in fact, no nonpreference visa numbers were available when Kwon applied and, as we have already pointed out, none are now available.

The regulations explicitly stated, "a nonpreference alien for whom a visa is not immediately available *may not file* an application for adjustment of status ..." 8 C.F.R. § 245.2(a)(3) (1976) (emphasis supplied). Kwon falls squarely behind this bar. It appears that the INS indeed did follow its internal operations procedures, but, even if it did not, the INS was, at the worst, guilty of inaction not misconduct. Unlike regulations, Operations Instructions, generally, do not have the force of law. They furnish only general guidance for service

---

menting upon the regulations just discussed, it said:

> According to the Visa Bulletin of the Department of State, no visa number was available for nonpreference visa applications on the filing date of petitioner's application, April 23, 1976. Hence the *visa petition* was not approvable upon initial review. [592 F.2d at 232, emphasis supplied.]

The *Suh* panel's failure to apply properly the intricate provisions of the regulations and the Operations Instructions is understandable. These are so convoluted and opaque as to defy comprehension. Counsel evidently failed adequately to explain them to the court and, when the misapprehension appeared, failed to supply the court with a fuller explanation and an opportunity to correct its opinion.

Not only did INS counsel fail to seek rehearing in that case, although it states that it knew *Suh* incorrectly interpreted the regulations, but when Kwon's case was heard by the panel, the INS did not contend that *Suh* was erroneous

but rather that it was factually distinguishable. When the INS initially sought rehearing of the panel decision in *Kwon*, it again attempted merely to distinguish *Suh*. Only when the *Kwon* panel squarely put to INS counsel the question whether *Kwon* and *Suh* were distinguishable did INS focus on the regulations now urged to be pertinent and their proper interpretation.

20. The current regulation, 8 C.F.R. § 245.2(a)(2) (1980), seems to retain this requirement. *See* for example, *Yoo v. INS*, 534 F.2d 1325, 1328 (9th Cir. 1976). The court, after *granting* Yoo's request to estop the government from denying his sixth preference status, stated that "agents may have no duty to inform aliens of matters which the aliens themselves have primary responsibility for knowing and could discover through the application of due diligence ..." Although Yoo had satisfied this requirement, it is clear Kwon has failed to do so.

employees. *See, e. g., Yan Wo Cheng v. Rinaldi,* 389 F.Supp. 583, 588–89 (D.N.J. 1975). *See also Soon Bok Yoon v. Immigration and Naturalization Service,* 538 F.2d 1211 (5th Cir. 1976); *But cf. Nicholas v. Immigration and Naturalization Service,* 590 F.2d 802, 807 (9th Cir. 1979) (interpreting O.I. 103.1(a)(1)(ii) as conferring substantive rights). The Operations Instructions at issue here confer no substantive rights on applicants.

In its brief the INS states "the public, of course, has a right to obtain guidance from the regulations for its dealings with the Service." We devoutly hope the INS and those who draft the regulations and Operations Instructions under which it operates will take this statement to heart. Whatever guidance the regulations furnish to those cognoscenti familiar with INS procedures, this court, despite many years of legal experience, finds that they yield up meaning only grudgingly and that morsels of comprehension must be pried from mollusks of jargon. There is nothing esoteric about the subject matter. The regulations concern simple matters of great concern to human beings, most of them of limited education. They should be so written as to be comprehensible by intelligent laymen and unspecialized lawyers without the aid of both lexicon and inner-circle guide.

Considering all the facts, however, we do not have the sense that an injustice has been done to Kwon under the circumstances involved.[21] To give him a visa priority date retroactively would put him ahead of other applicants for immigration who would then be required to wait behind him. The change in his status would be at the cost of other sixth preference immigrants, not at the expense of the INS. For the courts to grant such retroactive priorities would adversely affect the immigration pattern prescribed by Congress. It would accord Kwon not justice but, instead, benevolence at the expense of other innocent queue-standers.[22]

Kwon is in the United States unlawfully. No statute authorizes us and equity does not constrain us to protract further the four and one-half years that he has enjoyed the benefit of that visit. There is substantial basis on the record for the INS decision. Therefore, the petition for review is DENIED and the order of the Bureau of Immigration Appeals is AFFIRMED in all respects.

FAY, Circuit Judge, with whom RONEY and THOMAS A. CLARK, Circuit Judges, join, concurring in part and dissenting in part:

To the best of my understanding, the majority opinion holds that Kwon is not entitled to relief in this case because at the time Kwon applied for a visa and a change of status, there were no visas available in any of the categories in which Kwon was eligible to apply. On that basis, the majority concludes that an equitable retroactive remedy would be inappropriate. With that conclusion I totally agree. As the proposed opinion points out, the only circumstance in which it would be appropriate to grant relief *nunc pro tunc* is when the facts warranting such relief "existed at the time his application was originally submitted...." *Majority Opinion,* at 917. In Kwon's case, it is clear that the only categories for which he could have applied on March 31, 1976 were those having no available visas. For that reason, I wholeheartedly embrace the result reached by the majority.

**21.** We note that, had the INS faithfully complied with O.I. 245.2, Kwon would have been sent only a "notice of rejection." This notification would have informed him only that no nonpreference visas were then available for Korean citizens. He could have ascertained the identical information by simply consulting the Department of State Bulletin. Thus, we find additional support for our conclusion that Kwon was not unjustly treated and was not prejudiced by the actions of the INS.

**22.** Although we now overrule *Suh v. Immigration and Naturalization Service,* 592 F.2d 230 (5th Cir. 1979), we need not decide whether, under other circumstances warranting equitable relief but not constituting an estoppel, *Hibi* would preclude remedial action. *Cf. Schweiker v. Hansen,* — U.S. ——, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981).

In addition to the above discussed basis for affirming the Board of Immigration Appeal's (BIA) decision, the majority opinion sets out three additional grounds, each of which independently justifies the conclusion reached. In the initial proceeding, the INS District Director determined on January 26, 1978 that Kwon had withheld material facts when he first applied for his visa. That fact alone supports the conclusion that Kwon is not presently entitled to relief. Additionally, the District Director found that, assuming Kwon had not presented false information, he did not qualify for investor status,[1] the category in which he applied. That fact also justifies denying relief now. Finally, the ALJ who held a *de novo* hearing found that Kwon subsisted below the poverty level, that he had been an illegal alien prior to filing his application for status adjustment, and that, *contra* to his statement that he intended to enter this country as a tourist, he had a preconceived intent to reside in the United States permanently. For those reasons, the ALJ determined that it was inappropriate to exercise his discretion in that instance to grant Kwon relief.

I am of the opinion that any and all of the four bases discussed above justify our affirmance of the result reached by the BIA. The majority opinion states, however, that this Court may not consider the facts found by the District Director and the ALJ as the basis for our affirmance of the BIA decision. In support of its position, the proposed opinion cites *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *Real v. Simon*, 514 F.2d 738 (5th Cir. 1975); and *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). Those cases do not support the proposition for which they are cited, nor is that proposition now or has it ever been the law. The cases cited in the majority opinion stand for the simple and

justifiable proposition that an appellate court should not base its conclusion on facts or legal theories not raised with the administrative agency during that agency's review process. They do not mean, however, that the appellate court may consider only the latest pronouncement of an administrative agency in a given case. A cursory review of the decisions of this court reveals numerous cases in which we have affirmed or reversed the determination of an administrative agency on the basis of an ALJ's report as well as the intra-agency appellate review of that report. *See, e. g., Abilene Sheet Metal, Inc. v. N. L. R. B.*, 619 F.2d 332 (5th Cir. 1980); *Pigrenet v. Boland Marine & Manufacturing Co.*, 636 F.2d 1107 (5th Cir. 1980).

My quarrel with the proposed opinion is not, as the earlier discussion might suggest, with the exclusion of the three additional grounds for achieving the final resolution of this case. As I indicated at the outset, I agree totally with the majority's conclusion that equitable relief is inappropriate in this case. Were the disagreement only on the grounds for affirmance, I would not write this dissent. It seems to me, however, that having resolved the issue presented, the opinion should come to a close. It is a fundamental principle that the courts decide only cases or controversies and, having done so, they will not offer opinions on issues not before them. This is a most wise rule for the operation of our courts. The failure of the majority opinion to follow it in this case makes it only too clear that bad legal principles will all too often be established when courts offer resolutions for issues with which they are not confronted. Knowing the record amply supports the denial of any relief based upon the facts, it is difficult to understand why the majority opinion reaches out to decide the question of the availability of equitable relief to all

1. The effective regulations at the time Kwon applied for investor status required an applicant to establish (1) that he was seeking to enter the United States to engage in an agricultural or commercial enterprise in which at least $10,000 would be invested and (2) that he had at least one year of experience or training qual-

ifying him to engage in such a business. 8 C.F.R. § 212.8(b)(4) (1976); 22 C.F.R. § 42.-91(a)(14)(ii), (d) (1976). In the initial proceeding, the District Director found that Kwon's investment did not reach the required statutory amount.

cases involving immigration law, when that question is not before the Court. I do not mean to suggest that I am unappreciative of Judge Rubin's scholarly work in attempting to explain the intricate and convoluted operation of the immigration laws. My concern is that much of the information set forth would more appropriately be presented in a law review article, rather than in an opinion on which it has no bearing. I particularly object to the inclusion of such gratuitous discussion when it forms the basis for the reconsideration and reversal of an opinion of this Court which is not at issue in the case at bar and which was not reviewed by the court *en banc.*

Though the majority opinion had effectively resolved all issues presented in Kwon's appeal, it goes on to reconsider the decision by a panel of this Court in *Suh v. Immigration and Naturalization Service,* 592 F.2d 230 (5th Cir. 1979). Most astoundingly, the majority opinion overrules that decision totally with *dicta.* The opinion attacks *Suh* on the grounds that the panel erred when it determined that the INS had violated its own regulation. Accordingly, the opinion continues, it was erroneous to grant relief on the basis of the purported regulations violation. As if it were not enough to overrule the particular judgment of a case which was not at issue, the majority opinion goes on to say that, even if the panel was correct that a regulation was violated, there is no support for the legal principle on which the granting of equitable relief was based.

In addition to my belief that the majority opinion unjustifiably considered issues not before it, I am equally convinced the *Suh* opinion was correct on the question of the regulations violation and in applying the legal principle articulated.

Application of the majority opinion's own analytic framework demonstrates that this Court correctly decided in *Suh* that the INS had violated its own regulations. In *Suh,* Judge Ingraham concluded that the INS failed to comply with 8 C.F.R. § 245.2(a)(2) (1976)[2] when it retained Suh's adjustment application at a time when no visa numbers were immediately available. The majority opinion explains that the *Suh* panel erred by treating the adjustment application as a visa petition and, accordingly, applied the incorrect regulation. The opinion points out that it is only when an alien submits an adjustment application and a visa petition simultaneously that the INS is required to reject the former immediately in the event that a visa number is not available. In this the proposed opinion is correct. The problem I have is that in *Suh,* as in this case, the alien did file both documents and, accordingly the regulation was applicable. Both Suh and Kwon submitted form I–485 to the INS at a time when neither had a valid visa. In fact, both Suh and Kwon applied for non-preference investor status. In that situation, the majority tells us, "[i]f a person does not possess a valid visa and is not entitled to any of the special exemptions, his I–485 constitutes a simultaneous submission of a visa petition." *Majority Opinion,* at 914. Applying the same rule, the *Suh* panel determined that the I–485 filed constituted both an adjustment application and a visa petition, and accordingly concluded that 8 C.F.R. § 245.2(a)(2) (1976) was applicable. Not only is this result supported by the same rule but this opinion actually reaches the identical conclusion with respect to Kwon's filing of his I–485. The majority states, "... we treat Kwon's application [form I–485] as the simultaneous submission of a visa petition and an application for adjustment of status because he did not

2. That section provides in pertinent part:
   If a visa petition is submitted simultaneously with the adjustment application, the adjustment application *shall be retained* and processed *only if* the petition is found to be in order for approval upon initial review by an immigration officer, is approved, and *approval makes the visa immediately available.* (emphasis added)

In the *Suh* case, the I–485 form should not have been retained because, as the INS admits, approval could not have made a visa immediately available. This is true because there were no more visa numbers available that year for those seeking investor status, and the INS official who retained the form was or should have been aware of that fact.

possess a valid visa and was not entitled to any exemption." *Majority Opinion*, at 914. Accordingly, I am unable to understand why the majority reaches the conclusion that the same regulation found to be applicable in *Suh* was not violated.[3]

My most serious concern with the majority opinion is that it appears to hold that this Court is without power to order equitable relief of a retroactive nature to an alien whose opportunity to obtain citizenship in this country is prejudiced by the unjustified acts of the INS through its agents.[4] I would make the following responses to the proposed opinion: (1) the fact that the INS may have violated its internal operating procedure rather than the regulations is without significance to this Court's power to grant equitable relief to an alien whose rights are prejudiced by that violation; (2) this Court does not depend, as the proposed opinion suggests, on a statutory or regulatory authorization in order to exercise its inherent equitable powers; and (3) the Supreme Court's decision in *Immigration and Naturalization Service v. Hibi*, 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973), does not limit the equitable power of federal courts to only those cases in which an estoppel is appropriate, so long as the right to equitable relief is based on "affirmative conduct" of the INS.

The majority opinion makes much of the fact that the "worst" the INS did in *Suh*

was violate its own Operations Instructions. Since these instructions do not have the force of law, unlike the regulations, the majority reasons that we may not correct an unjust result arising from their violation. Assuming, *arguendo*, that only the Operating Instructions were violated in *Suh*, I conclude that such legal reasoning is wholly fallacious. It confuses that underlying jurisprudential distinction between law and equity. If regulations, having the force of law, were violated, the alien would have a right to both legal and equitable relief. When, however, an alien is prejudiced by the unjustifiable, yet not illegal acts of the INS, his only recourse is to seek equitable relief.

The majority's next position, that this Court can not grant equitable relief because it is not statutorily provided for, is equally untenable. Such an argument fails to recognize that the power of the federal courts to grant equitable relief arises out of their constitutional grant of authority under Article III, and does not depend on specific legislative authorization. Were this not the case, the power of federal courts to exercise their equitable powers would be limited to those very few situations in which Congress specifically authorized them to do so. This is clearly not the law. One need only look to *Immigration and Naturalization Service v. Hibi*, 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973), cited in the majority opin-

3. Apparently, even the INS admits that the regulations were violated in *Suh*. Not only did the INS not seek a rehearing of that decision, it has not asserted here that that decision was erroneous. Rather, the INS has attempted, successfully I might add, to distinguish *Suh* from the case at bar.

4. I say that the majority opinion appears to hold that this Court is without equitable power to grant retroactive relief because certain internal inconsistencies in the opinion make it impossible to say that that definitely is the conclusion reached. For example, the proposed opinion begins with the unequivocal position that this Court may not grant equitable relief *in any INS case* because it is not authorized by regulation or statute. That position is then followed by the statement that if equitable relief is to be granted *nunc pro tunc, in any case,* precisely what was previously said to be improper, it must appear that the alien was eligi-

ble then for the status change being authorized now. I would add that I am in total agreement with this last statement. The proposed opinion goes on to say that equitable relief is inappropriate *in this case* because Kwon wasn't eligible for labor certification at the time he applied for investor status. I also agree with that. Finally, the opinion closes with the statement that it does not decide whether this Court does or does not have the power to grant the type of equitable relief granted in *Suh*.

As I count, the proposed opinion expresses three mutually exclusive positions on the question of the power of this Court to grant equitable relief. Because I fear that the opinion will be cited for the proposition that this Court lacks the power to grant equitable relief of a retroactive nature, I have written the remainder of this opinion as if that were the clear holding of the proposed opinion.

ion, for proof that the Supreme Court concluded that equitable relief, although not appropriate under the facts of *Hibi*, was within the power of the federal courts to grant in the proper circumstances. *See, Santiago v. Immigration and Naturalization Service*, 526 F.2d 488 (9th Cir. 1975) (*en banc*), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); *Yoo v. Immigration and Naturalization Service*, 534 F.2d 1325 (9th Cir. 1976).

The final point made in the proposed opinion is that if equitable relief is ever proper, *Hibi* limits the situations in which it should be granted to those that constitute an estoppel. There are several reasons why such an interpretation is incorrect. In the first place, as the Ninth Circuit Court of Appeals noted in *Santiago*, the ruling in *Hibi* is unique in that the Court was asked to estop the government from enforcing a broad decision of the Executive Branch made some twenty years earlier relating to post-World War II policy as it applied to a large class of people. There is a tremendous difference between seeking to estop the government when it is acting in its sovereign capacity and when it is performing a largely ministerial function. As Judge Choy said in his concurring and dissenting opinion in *Santiago*

> The conduct at issue in *Hibi* was not the negligence or malfeasance of minor officials, but a deliberate decision of policy by the Attorney General. Although acting in the face of a contrary congressional purpose, the executive branch was attempting to advance diplomatic relations between the United States and the government of the Philippines. Regardless of whether the Government's conduct constituted an abuse of discretion, its decisions were so patently of the type committed to the executive branch that the Court was extremely reluctant to nullify them over 20 years later in order to relieve one individual instance of hardship.

526 F.2d at 496. Secondly, *Hibi* does not suggest that estoppel is the only type of equitable relief that may be granted. The simple reason that estoppel was discussed in *Hibi* is that it was the type of equitable relief that would have been appropriate to the facts of the case. As I read *Hibi*, we are instructed that equitable relief against the government is only appropriate if the injury complained of is caused by "affirmative misconduct" of the government agent. I see nothing in *Hibi* that says we may grant equitable relief only in those cases in which an estoppel is factually appropriate. Therefore, in my opinion, the suggestion, that the relief granted in *Suh* was inappropriate because it was not an estoppel, is simply wrong. One need only read the facts of *Suh* to see that there was nothing from which to estop the government. If relief was to be effective it had to be of a mandatory rather than a prohibitory nature. The final point I would make with respect to *Hibi*, is that whatever else the elusive term "affirmative misconduct" may mean,[5] it most certainly must encompass a

---

5. As the Ninth Circuit pointed out in *Santiago*

The Court in *Hibi* did not elaborate on the meaning of "affirmative misconduct" and we do not believe that it would be productive to dwell overlong on the possible reasons for the inclusion of the modifier "affirmative." That term, as well as the use in *Hibi* of a quotation from *Utah Power & Light Co. v. United States* concerning "neglect of duty," suggests that a distinction might be drawn between nonfeasance and misfeasance. But these are slippery terms. The two "failures" in *Hibi* can be viewed as either, a point which Mr. Justice Douglas made in characterizing the governmental conduct there as a "deliberate effort."

526 F.2d 492–493. In his concurring and dissenting opinion, Judge Choy elaborated further, saying

"Affirmative" and "negative," like "misfeasance" and "nonfeasance," are indeed slippery terms. Each one of the claims paraphrased negatively can readily be restated affirmatively; *e. g.*, the immigration officer admitted Khan even after learning that Khan was not accompanying or following to join his father. But it is not *how* we cast the facts, but the facts themselves that should dictate the nature of relief warranted.

In *Hibi*, it is true, the Court denied estoppel relief based on the "failure to fully publicize" the right of an ex-Philippine Scout to apply for naturalization and the "failure to have stationed" in the Philippines a naturalization

situation like that in *Suh* where the INS fails in its duty to provide the applicant alien with the information which the regulations and its own operating procedures require it to provide.

## Conclusion

Being personally convinced that my most scholarly brother errs in traveling far out of his way to abolish equitable retroactive remedial relief, I would like to offer several reasons why, in the proper case, it is both appropriate and essential. One conclusion that anyone who reads the majority opinion must reach is that the INS regulations are incomprehensible. Their apparent internal inconsistencies defy comprehension by even the most learned in our society. As the majority opinion admits, "[w]hatever guidance the regulations furnish to those cognoscenti familiar with INS procedures, this Court, despite many years of legal experience, finds that they yield up meaning only grudgingly and that morsels of comprehension must be pried from mollusks of jargon." *Majority Opinion,* at 919. Consider further that the individuals whose responsibility it is to divine some sense from these regulations are the aliens themselves. These are not legal scholars; they often are poor, uneducated individuals, barely conversant in what to them is the foreign language of English. It seems to me that the INS regulations and internal operating rules that instruct INS agents to provide applicant aliens with certain information were created with the knowledge of these unequal positions in mind. Though the personnel within INS are being asked to perform the impossible [6] in many parts of our country, the law requires them to follow the rules set down for the performance of their job. When they fail to meet this funda-

representative during all the period Hibi was eligible for naturalization. 414 U.S. at 9, 94 S.Ct. 19 [at 21, 38 L.Ed.2d 7]. Still, the Court intimated that conduct adverted to in *Montana v. Kennedy*, 366 U.S. 308, 315, 81 S.Ct. 1336 [1341], 6 L.Ed.2d 313 (1961), might be "affirmative misconduct" warranting estoppel in cases of this nature. *Id.* [414 U.S.] at 8, 94 S.Ct. 19 [at 21, 38 L.Ed.2d 7]. *Montana* refers the reader to *Podea v. Acheson,* 179 F.2d 306 (2d Cir. 1950), and *Lee You Fee v. Dulles,* 236 F.2d 885, 887 (7th Cir. 1956).

In *Podea,* a United States citizen living in Romania asked the American consul there for a United States passport in order to avoid Romanian military service. The consul refused the passport on the basis of an erroneous ruling of an official in the State Department that Podea had lost his United States citizenship. Podea was conscripted into the Romanian army and took its oath of allegiance. Held: Podea did not voluntarily expatriate himself since his acts were primarily caused by erroneous advice of the State Department.

*Lee You Fee* itself presents no case of estoppel, but at 236 F.2d 887 discusses three cases that did; *Lee Bang Hong v. Acheson,* 110 F.Supp. 48 (D.Haw.1951); *Lee Hong v. Acheson,* 110 F.Supp. 60 (N.D.Cal.1953); and *Lee Wing Hong v. Dulles,* 214 F.2d 753 (7th Cir. 1954). In all three cases, foreign-born United States citizens who made timely applications for entry documents were prevented from reaching the United States by their sixteenth birthdays because the American consular officials abroad refused to issue or delayed issuance of the documents. Held: The failure of the consular officials did not divest those persons of their United States nationality. As the court in *Lee You Fee* commented about these three cases: "Certainly the Government should not be heard to contend that a plaintiff had been deprived of his citizenship because of the failure of the plaintiff to do something which the officials of the Government had carelessly or willfully prevented his doing." 236 F.2d at 887.

It is unclear, therefore, what behavior the Supreme Court considers to be "affirmative misconduct." Certainly the governmental conduct "adverted to" in *Montana v. Kennedy* partook more of the nature of error or carelessness than of the extreme blameworthiness which the majority apparently contemplates as the only basis for estoppel. Rather than juggle the terminology found in the *Hibi* opinion, I would inquire into the interests which the *Hibi* Court sought to protect."

526 F.2d 495–96.

**6.** Enormous problems exist in many of our border states including Texas, Florida and California. Cases pending in this Court point out the incredible number of applicants being processed. Classes have been certified to control the litigation. All are aware of the Cuban and Haitian boat lifts. None of this, however, lessens the duty of those charged with the responsibility of processing aliens and to date this Court has not compromised such. It appears we will now travel a different road.

mental obligation, for whatever reason, and that failure operates to the prejudice of an applicant alien who otherwise is qualified for citizenship, it is the duty of this Court to use whatever equitable tools are at its disposal to restore the injured party to his or her rightful position.

We live in the greatest nation on Earth. It should come as no surprise that people of all races, creeds, and nationalities would desire to become citizens. It was the desire to live in this great nation that brought many of our ancestors to these shores in the last two centuries. To decide the propriety of granting retroactive remedial relief, one need only ask oneself how he would hope his ancestors would have been treated had the negligence of an INS officer stood as the only bar between citizenship and deportation to a hostile land.

Accordingly, I concur in the result achieved and respectfully dissent from the remainder of the proposed opinion.