**Anissa Rene UZUEGBU and Boniface Mmuoemenam Uzuegbu**

v.

**John B.Z. CAPLINGER, in his capacity as a District Director of the Immigration and Naturalization Service of the United States Department of Justice.**

**Civ. A. No. 89–4099.**

United States District Court,
E.D. Louisiana.

Aug. 13, 1990.

---

**1202**

Thomas P. Adams, Law Office of David A. Kattan, New Orleans, La., for plaintiffs.

Reneé Clark McGinty, Asst. U.S. Atty., New Orleans, La., for defendant.

### ORDER AND REASONS

PATRICK E. CARR, District Judge.

This matter is before the Court on cross-motions for summary judgment [Document Nos. 11 and 17].

Determining in its discretion that oral argument is unnecessary, the Court previously cancelled the hearing on the motions. For the following reasons, the Court now GRANTS IN PART AND DENIES IN PART each motion; the Court rules for the plaintiffs on their first claim and for the defendant on their second.

Boniface Uzuegbu is an alien. In 1985, the INS issued and served on him an order to show cause why he should not be deported for violating conditions of his visa. In 1987, Mr. Uzuegbu married a U.S. citizen. At some time either before or after the marriage, the order was filed with the Office of the Immigration Judge. The final deportation hearing has not yet been held. Because the marriage occurred after the order was served, the defendant revoked approval of the wife's petition to have her husband classified as an immediate relative under 8 U.S.C. §§ 1151(b) and 1154(a)(1);

as statutory authority for his action, the defendant relied solely on 8 U.S.C. §§ 1154(h) and 1255(e)(2), which prescribe granting immediate relative status for an alien on the basis of a marriage entered into while deportation proceedings are "pending" against the alien. The defendant has also denied Mr. Uzuegbu's request under 8 CFR § 274a.12(c)(13) for employment authorization pending the deportation proceedings.

In dispute is an issue of apparent first impression, that is, when deportation proceedings are first considered "pending" for the purposes of 8 U.S.C. §§ 1154(h) and 1255(e)(2). Under the INS regulations applicable to the plaintiffs' particular case, the Court determines that the controlling date is the date the order to show cause is filed. Because there is no evidence that the order was filed before the marriage was entered into, the Court holds that the defendant abused his discretion in revoking Mr. Uzuegbu's immediate relative status.

Also in dispute is the defendant's refusal to grant Mr. Uzuegbu employment authorization. In *Perales v. Casillas*,[1] the Fifth Circuit recently rejected a similar claim. Because *Perales* is controlling, the Court rejects this second claim.

### I.

Plaintiff Boniface Mmuoemenam Uzuegbu is a native and citizen of Nigeria. In January 1983, he entered the United States on an F–1[2] student nonimmigrant visa. Aliens admitted on these visas are prohibited from working "off-campus" unless granted authorization from the Immigration and Naturalization Service (INS)[3] and may be deported if they work off-campus

---

**1.** 903. F.2d 1043 (5th Cir.1990).

**2.** *See* Immigration and Nationality Act as amended (INA) § 101(a)(15)(F)(i), 8 U.S.C. § 1101(a)(15)(F)(i); *see also* 8 CFR § 214.2(f).

Unless otherwise noted, all CFR citations are to the 1990 edition. If the citation bore a different number at the time at issue in this action, the former citation number is included as well.

**3.** *See generally* 8 CFR § 214.2(f)(9)(ii)–(iii) (setting forth the conditions under which such an alien may seek "off-campus" employment); *see also id.* § 274a.12(c)(3)(i) (promulgated in May 1987) (replacing 8 CFR § 109.1(b)(1)(ii)). Similar but less restrictive limitations apply to "on campus" employment. *See generally id.* § 214.2(f)(9)(i); *see also id.* § 274a.12(b)(6) (promulgated in May 1987).

without first obtaining such authorization.[4]

### A.

In the afternoon of October 18, 1985, two INS agents arrested Mr. Uzuegbu.[5] Contending that his arrest was improper, Mr. Uzuegbu states by affidavit:

That ... agents of the Immigration and Naturalization Service ... had been looking for one of his neighbors; that they saw him standing in front of his apartment; that they began questioning him about his immigration status when they realized he was not from this country; that they forced him to get in their car with them; that they forced him to state that he had been working illegally; and that at no time did they inform him of his rights.

By counter-affidavit, one of the arresting agents, Supervisory Special Agent Dan L. Barlett, describes a different version of the encounter:

On October 18, 1985 at approximately 3:30 PM,

Boniface Uzuegbu was encountered at the apartment complex at 1330 Johnson Street, Lafayette, Louisiana. This apartment complex is one block from the University of Southwestern Louisiana campus. Initially Mr. Uzuegbu refused to produce any alien registration. When Mr. Uzuegbu did produce his passport and Social Security Card, Special Agent Baumgardner made a check with the office of International Students for the University of Southwestern Louisiana, and also called the Immigration and Nat-

uralization Service Office at 701 Loyola Avenue, New Orleans to have record checks through various indices run on Mr. Uzuegbu.

It was through these record checks that Special Agent Baumgardner learned and advised affiant that Mr. Uzuegbu had been employed illegally at three local Lafayette area restaurants and was currently employed at Steak and Ale Restaurant. Mr. Uzuegbu denied employment and only after being advised that he would be taken to Steak and Ale and confronted with the manager there did he admit he was working. At approximately 4:00 PM, Mr. Uzuegbu was advised of his rights on Form I-214. Mr. Uzuegbu refused to sign the Waiver of Rights and he was not interrogated.[6]

In connection with the arrest, defendant John B.Z. Caplinger, who was then Assistant District Director for Investigations at the New Orleans INS Office, issued an Order to Show Cause, Notice of Hearing, and Warrant for Arrest of Alien (Form I-221S) against Mr. Uzuegbu.[7] The form alleges that Mr. Uzuegbu "w[as], without the permission of the U.S. Immigration and Naturalization Service, employed by Steak and Ale Restaurant, 3651 Ambassador Caffrey Parkway, Lafayette, Louisiana from January 1985 until June 1985 as a dishwasher." According to a notation on the form, Agent Barlett served the form on Mr. Uzuegbu that evening. On or before October 24, 1985, Mr. Uzuegbu was released on bond.[8]

The government alleges an INS attorney sent the original Order to Show Cause

---

**4.** *See Tashnizi v. INS*, 585 F.2d 781, 782 (5th Cir.1978) (per curiam); INA § 241(a)(9)(A) (formerly INA § 241(a)(9)), 8 U.S.C. § 1251(a)(9)(A) (formerly 8 U.S.C. § 1251(a)(9)).

**5.** INS agents have prescribed powers to arrest without warrant certain persons. *See* INA § 477(a)(2), 8 U.S.C. § 1357(a)(2); 8 CFR § 287.3. They have broader powers to interrogate without warrant such persons. *See* INA § 477(a)(1), 8 U.S.C. § 1357(a)(1); 8 CFR § 287.3. In these motions at least, the Uzuegbus do not complain of the warrantlessness of the arrest.

**6.** Under the caption Warning of Rights, a Form I-214 contains standard *Miranda*-type warnings

about the right to remain silent and the right to counsel and that anything the person says may be used against him "in court, or in any immigration or administrative proceeding." *See generally* 8 CFR § 242.2(c)(2) (formerly 8 CFR § 242.2(a)(2)).

**7.** *See id.* § 242.1; *see also* INA § 242(a)(1) (formerly INA § 242(a)), 8 U.S.C. § 1252(a)(1) (formerly 8 U.S.C. § 1252(a)); *id.* § 242(b), 8 U.S.C. § 1252(b).

**8.** *See* INA § 242(a)(1)(B) (formerly INA § 242(a)(2)), 8 U.S.C. § 1252(a)(1)(B) (formerly 8 U.S.C. § 1252(a)(2)); 8 CFR § 242.2(d) (formerly 8 CFR § 242.2(b)).

(OSC) to an immigration judge in Atlanta, Georgia. The sole evidence the government presents on this point is a certified copy, from the INS records, of a memorandum dated October 25, 1985; the memorandum contains the attorney's purported signature, is addressed to an immigration judge in Atlanta, and merely indicates: "Attached please find ... original order to show cause." While as indicated below it is implicit that an immigration judge ultimately received at least a copy of the OSC, the record does not indicate when or even whether this memorandum, or the original of the OSC, was in fact mailed to or actually received by any immigration judge.

Thereafter, according to the INS record submitted by the government, the INS took no action on Mr. Uzuegbu's proceeding for over 1½ years. On May 5, 1987, the Executive Office for Immigration Review (EOIR) in Oakdale, Louisiana mailed Mr. Uzuegbu (at his by-then former address) [9] a Notice of Hearing on May 15, 1987 for deportation proceedings.[10] The record does not show whether he received the notice. Mr. Uzuegbu did not appear at the hearing, and the immigration judge ordered "that the case be administratively closed without prejudice. No further action will be taken in this matter until such time as the respondent is located and the matter recalendared for further proceedings." [11]

On August 25, 1987, an INS attorney filed with the New Orleans Office of the Immigration Judge a Motion to Recalendar; the motion contains a notation that Mr. Uzuegbu had moved to a different address.

An unsigned memorandum from the INS records indicates that on September 29, 1987, a hearing was set for October 29, 1987. The memorandum contains a notation: "Married but under Marr[iage] Fraud Act; [therefore] no adm[inistrative] relief available." The memorandum further indicates that the hearing was held on October 29, 1987, that Mr. Uzuegbu was represented by counsel, and that he was "found deportable" and given a voluntary departure date of January 15, 1988.

The record includes a Decision of the Immigration Judge (Form EOIR–6) that Mr. Uzuegbu "is deportable on the charge(s) in the Order to Show Cause" and that "in lieu of an order of deportation respondent be granted voluntary departure ... on or before Jan. 15, 1987 [sic; should read 1988]." [12] The decision contains no written "discussion of the evidence and findings as to deportability." [13] The further records of the hearing were destroyed by fire in late November 1987 during a prison riot at the Oakdale Federal Detention Center, which the INS uses as a storage center for many of its official documents.

On November 6, 1987, Mr. Uzuegbu filed a timely notice of appeal to the Board of Immigration Appeals. The notice sets forth various evidentiary bases for the appeal.[14]

Meanwhile, on April 3, 1987, Mr. Uzuegbu married plaintiff Anissa Rene Handy, a U.S. citizen by birth; there is no evidence or suggestion that the marriage was fraudulent or improper in any respect such as to

---

**9.** This Notice of Hearing was sent to the address typed over 18 months earlier on the original OSC. According to the Form G–325A signed by Mr. Uzuegbu and attached to Mrs. Uzuegbu's Form I–130 visa petition, Mr. Uzuegbu had moved in January 1986 and then again in April 1987.

Within 10 days of each change of address, a resident alien such as Mr. Uzuegbu is required to report the change on a Form AR–11 that is to be mailed to the INS in Washington, D.C. *See* INA § 265(a), 8 U.S.C. § 1305(a); 8 CFR § 265.1; *see also* INA § 266(b), 8 U.S.C. § 1306(b) (describing the penalties for failure to give such notice). There is, however, no contention that Mr. Uzuegbu did not comply with these reporting requirements.

**10.** *See* 8 CFR § 242.1(b).

**11.** *See id.* § 242.1(c) (when service by mail is used and the respondent does not appear, the OSC must be re-served by personal service).

**12.** On voluntary departure, see INA § 242(b), 8 U.S.C. § 1252(b); *id.* § 244(e)(1) (formerly INA § 244(e)), 8 U.S.C. § 1254(e)(1) (formerly 8 U.S.C. § 1254(e)); 8 CFR §§ 242.17(b), 243.1, 244.1.

**13.** 8 CFR § 242.18(a).

**14.** *See id.* § 242.21(a) (formerly 8 CFR § 242.21); *see also id.* §§ 3.1(b)(2), 3.36.

evade the immigration laws. On September 16, 1987, Mrs. Uzuegbu filed a verified INS Form I–130 visa petition seeking to classify her husband as an immediate relative.[15] On November 15, 1987, the INS approved the petition.

On June 29, 1989, defendant Caplinger, who had now become the District Director of the New Orleans INS Office, wrote Mrs. Uzuegbu a letter notifying her that her petition was "automatically revoked as of the date of approval." The letter includes the following explanation:

Record material indicates that you contracted marriage with the alien beneficiary on April 3, 1987, at Lafayette, Louisiana. The record further reflects that your spouse was served with an Order To Show Cause and Warrant for Arrest on October 15, 1985.

Review of the evidence indicates that the petition was approved in error and that Mr. Uzuegbu was statutorily ineligible to have an Immediate Relative Petition approved on his behalf until he has resided outside the United States for two years.

As authority, the letter cites 8 CFR § 205.1(a)(10) and 8 U.S.C. § 1154(h).

Meanwhile, on January 17, 1989, the INS Assistant District Director of Investigations in New Orleans issued a "superseding" Order to Show Cause and Notice of Hearing (Form I–221), which repeats verbatim the allegations set forth in the OSC issued in October 1985. On January 19, 1989, the INS filed a motion with the New Orleans Office of the Immigration Judge to dismiss "the matter, without prejudice, under the provisions of 8 C.F.R. 242.7(b)" on the basis that the January 17th order was "improvidently issued" inasmuch as "[t]here was a copy of the Order to Show Cause issued on October 18, 1985 in the respondent's file." The original motion contained an improper caption (although the proper case number, A26 448 876); on

January 29, 1989, the INS filed a motion to amend its motion to dismiss proceedings; this latter motion corrected the technical error. The record contains no evidence of the disposition of these motions.

Then, on February 1, 1989, the INS filed with the New Orleans Office of Immigration Judge a Motion to Recalendar; asserting that the entire record of the prior deportation hearing had been destroyed in the Oakdale riot, the INS requested a de novo deportation hearing. A hearing date was set, but the hearing has been stayed pending the outcome of this lawsuit.

By affidavit, Mr. Uzuegbu states that "he has never applied for U.S. legal permanent resident status."

### B.

On August 16, 1989, Mr. Uzuegbu filed a request for employment authorization under 8 CFR § 274a.12(c)(13). Under the heading "present or most recent employment," he indicated a job at a fast food restaurant in Lafayette at a salary of $450 per month.[16] Under other headings, he indicated that his family's monthly rent was $160 and monthly utilities totalled $388, and that his family had no other source of income and minimal present assets. Under the heading present financial obligations, he wrote: "helping finance my wife's education through college." Under the heading remarks, he wrote: "All I am asking is a chance to do any type of work to help my family. Especially now my wife's health condition does not permit her to work." Attached to the request is a report dated July 25, 1989 from the Acadian Region Heart Clinic concerning Mrs. Uzuegbu. The report indicates she had miscarried the couple's first child and was three-months pregnant with a second; the report includes an impression: "Mild mitral valve prolapse and mitral insufficiency.

---

**15.** *See* INA § 204(a)(1), 8 U.S.C. § 1154(a)(1); 8 CFR § 204.1.

**16.** While the record does not specifically indicate whether the INS had granted Mr. Uzuegbu authorization for this employment, the record (specifically plaintiff counsel's letter of December 8, 1989 and Caplinger's reply letter of December 18, 1989) indicates that the INS had granted Mr. Uzuegbu employment authorization at some time.

Borderline hypertension probably secondary to exogenous obesity."

On November 8, 1989, defendant Caplinger wrote Mr. Uzuegbu a letter denying his request. The letter reads as follows:

This is in response to your request for employment authorization filed on August 16, 1989. A review of the records of this Service reveals that you entered the United States on January 9, 1983 at Miami as a non-immigrant student. To obtain a non-immigrant student visa you had to have indicated to the Consular Officer that you would not take up employment in the United States. The record reveals that you took up unauthorized employment in January 1985 and you were arrested by Special Agents of this Service on October 18, 1985 because you were out of status due to your unauthorized employment. A violation of your status does not entitle you to increased benefits under the Immigration laws of this country.

Your present request for employment authorization is based upon your desire to support your wife, who you married on April 3, 1987, after you had been in deportation proceedings for a year and a half. There is little likelihood that legal status will ensue in the near future and there does not appear to be a basis for discretionary relief in your deportation proceedings. After a review of the circumstances of your case I find that your request for employment authorization must be, and is, hereby denied.

On December 8, 1989 the Uzuegbus' attorney wrote defendant Caplinger to request that he reconsider his denial of work authorization. After setting forth various arguments of law, the letter states that Mrs. Uzuegbu had a second miscarriage and was working 15–25 hours a week at $4.00/hour and that "[t]his is the couple's only income, against which must be balanced considerable debts from medical and legal fees."

On December 18, 1989, defendant Caplinger wrote back to the Uzuegbus' attorney to deny the request for reconsideration. The letter states:

Our original decision did not imply that the subject's violation of his status made him ineligible for work authorization, but stated it did not entitle him to increased benefits. Also, consideration of this factor is not inappropriate.

Section (c)(13) [of 8 CFR § 274a.12] identifies four factors which may be considered. The fact that the subject violated his status is relevant to deciding whether legal status may ensue and whether there is a basis for discretionary relief.

It appears that continued litigation in this case is primarily to prolong the subject's stay in the United States even though a visa petition cannot be approved pursuant to section 204(h) of the I & N Act [8 U.S.C. § 1154(h)]. This issue has already been before the BIA and the Fifth Circuit Court of Appeals. (See BIA decision dated May 25, 1989 in re Pritchett, A26 443 195, where [the Uzuegbus' co-counsel] was the alien's representative.) Had the subject departed following the original order of the Immigration Judge, he could have already completed the two years of foreign residence.

A brief period of employment was granted previously solely because of the claim that the wife could not work during the last months of pregnancy. This action did not preclude a later request being denied.

Based on the facts in this case, my original decision of November 8, 1989, denying employment authorization under 8 CFR 274a.12(c)(13) is affirmed.

II.

On September 15, 1989, Mr. and Mrs. Uzuegbu filed this lawsuit against Deputy Director Caplinger in his official capacity. In March 1990, they filed a first amended complaint, adding a second count.

The first count concerns the defendant's revocation of approval of the petition for immediate relative status. The Uzuegbus pray that the Court declare the revocation "unlawful, null, and void," permanently enjoin the defendant from revoking his approval, and order the defendant to grant

reinstatement of approval. The Uzuegbus offer four grounds to support this claim.[17] First, 8 CFR § 205.1(a)(10) does not apply because the INS cannot establish that Mr. Uzuegbu was "under proceedings" when he married his wife, specifically, that the OSC had been filed with the Office of the Immigration Judge before the marriage. Second, the regulation does not apply because Mr. Uzuegbu is not yet "an applicant for adjustment of status to that of a permanent resident." Third, the defendant's application of the regulation exceeded the statutory authority under 8 U.S.C. § 1155, for the statute does not apply where the beneficiary under a petition has already lawfully entered the United States. Fourth, Mr. Uzuegbu was not "under proceedings," within the meaning of the regulation, because the OSC "flowed from an illegal arrest and 'confession.'"

The second count concerns the defendant's denial of Mr. Uzuegbu's request for work authorization. The Uzuegbus pray that the Court declare the denial "unlawful, null, and void" and order the defendant "to grant work authorization to Mr. Uzuegbu during the pendency of his deportation proceedings, including any appeal period thereunder."

The parties now cross-move for summary judgment on both counts.

### III.

■ For the following reasons, the Court agrees with the Uzuegbus' first ground for relief on the first claim. Thus, the Court need not address their remaining grounds on that claim.[18]

### A.

Generally, aliens seeking immigrant status are subject to a numerical quota system under 8 U.S.C. §§ 1151(a) and 1152 with a corresponding allocation system under 8 U.S.C. § 1153. Under 8 U.S.C. § 1151(b), however, aliens who are "immediate relatives" are to "be admitted as such, without regard to the[se] numerical limitations." A spouse of a U.S. citizen is among those defined as an "immediate relative" under § 1151(b).[19]

For aliens who are immediate relatives, 8 U.S.C. § 1154 provides as follows in pertinent part:

> **(a)(1)** Any citizen of the United States claiming that an alien is entitled ... to an immediate relative status under section 1151(b) of this title ... may file a

---

**17.** In their complaint, the Uzuegbus asserted two further grounds, but do not pursue them in these motions: first, that, in applying 8 CFR § 205.1(a)(10), the defendant denied them due process of law, for they received neither prior notice nor an opportunity to present evidence or for administrative appeal; and second, that the original OSC "was destroyed and is therefore null, as proven by the issuance by INS of a new OSC containing the exact same allegations and charge."

Inasmuch as the Uzuegbus are receiving the instant judicial review of their claim, this first additional ground appears moot or at least harmless reviewable error. The certified copy of the OSC from the INS records belies this second additional ground (further, the Uzuegbus' complaint admits that the defendant issued the original OSC in October 1985). *See* 28 U.S.C. § 1733(b); *cf. id.* § 1734(a); INA § 103(a), 8 U.S.C. § 1103(a); 8 CFR § 103.7(d)(2).

**18.** The Court merely notes the following about these other three grounds. At the best for the Uzuegbus, their second and third grounds could

afford only temporary relief: on the one hand, the ultimate benefit of immediate relative status occurs only when the alien applies for permanent resident status; on the other, an alien with immediate relative status, like other aliens, may be found deportable if he violates conditions of his visa and thus may have to re-enter the United States after a voluntary departure in order to become a permanent resident. While Mr. Uzuegbu's affidavit creates a genuine issue of fact whether the arresting agents coerced, or to use Mr. Uzuegbu's term "forced," him to give certain statements, *see Bustos–Torres v. INS,* 898 F.2d 1053, 1057 (5th Cir.1990), this defense is for the immigration judge (and, on any appeal, the BIA, the Fifth Circuit, or the Supreme Court) to address in the deportation proceedings inasmuch as the defense goes only to the admissibility of the statements at the deportation hearing; collateral review of this defense by this Court would circumvent Congress' determination of who should review such questions.

**19.** *Anetekhai v. INS,* 876 F.2d 1218, 1219 (5th Cir.1989) (citing INA § 201(b), 8 U.S.C. § 1151(b)).

petition with the Attorney General for such classification. . . .

. . . .

(b) After an investigation of the facts in each case ... the Attorney General shall, if he determines that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative specified in section 1151(b) of this title ..., approve the petition. . . .

. . . .

(c) Notwithstanding the provisions of subsection (b) of this section no petition shall be approved if (1) the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States ..., by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws, or (2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.

. . . .

(e) Nothing in this section shall be construed to entitle an immigrant, in behalf of whom a petition under this section is approved, to enter the United States ... as an immediate relative under section 1151(b) of this title if upon his arrival at a port of entry in the United States he is found not to be entitled to such classification.

. . . .

(h) Notwithstanding subsection (a) of this section, a petition may not be approved to grant an alien immediate relative status ... by reason of a marriage which was entered into during the period described in section 1255(e)(2) of this title, until the alien has resided outside the United States for a 2–year period beginning after the date of the marriage.

Subsection (h) was added as part of the Immigration Marriage Fraud Amendments of 1986 (IMFA)[20] and applies to all marriages entered into on or after November 10, 1986, the date the IMFA was enacted.[21] The period referred to in subsection (h) is defined in 8 U.S.C. § 1255(e)(2) as "the period during which administrative or judicial proceedings are pending regarding the alien's right to enter or remain in the United States."

Under §§ 1154(h) and 1255(e)(2), an alien who marries a U.S. citizen while deportation proceedings "are pending" against the alien must live outside of the United States for at least two years after the marriage in order to become eligible for immediate relative status, regardless whether the INS determines under § 1154(c) that the marriage was bona fide or fraudulent. While courts universally recognize the harsh burden of § 1154(h) on legitimate marriages between aliens and U.S. citizens[22] and at least two courts have declared § 1154(h) unconstitutional,[23] the Fifth Circuit has upheld its constitutionality in *Anetekhai v. INS*.[24]

20. Pub.L. No. 99–639, § 5(b), 100 Stat. 3537, 3543 (Nov. 10, 1986).

21. *See id.* § 5(c), 100 Stat. at 3543.

22. *See, e.g., Azizi v. Thornburgh,* 908 F.2d 1130, 1131–32 (2d Cir.1990); *Anetekhai,* 876 F.2d at 1224; *Almario v. Attorney General,* 872 F.2d 147, 152 (6th Cir.1989); *see also Blancada v. Turnage,* 891 F.2d 688, 690 (9th Cir.1989) (describing the alien's arguments about § 1154(h) as "forceful").

23. *See Escobar v. INS,* 896 F.2d 564 (advance sheets only), 1990 U.S.App. LEXIS 1307, 1990 WL 6857 (D.C.Cir.1990) (2–1), *reh'g en banc pending* (No. 89–5037); *Manwani v. United States Department of Justice,* 736 F.Supp. 1367 (W.D.N.C.1990), *appeal pending,* No. 90–2122

(4th Cir.); *see also Azizi,* 908 F.2d at 1142 (Cardamone, J., dissenting).

24. 876 F.2d 1218 (5th Cir.1989), *aff'g* 685 F.Supp. 599 (E.D.La.1988) (Duplantier, J.). The vast majority of courts to address the issue have reached the same conclusion. *See Azizi,* 908 F.2d 1130 (2d Cir.1990), *aff'g* 719 F.Supp. 86 (D.Conn.1989); *Almario,* 872 F.2d 147 (6th Cir. 1989); *Ademi v. Moyer,* 1989 U.S.Dist. LEXIS 5953, 1989 WL 56904 (N.D.Ill.1989); *Minatsis v. Brown,* 713 F.Supp. 1056 (S.D.Ohio 1989); *Escobar v. INS,* 700 F.Supp. 609 (D.D.C.1988), *rev'd,* 896 F.2d 564 (advance sheets only) (D.C.Cir. 1990), *reh'g en banc pending* (No. 89–5037); *Smith v. INS,* 684 F.Supp. 1113 (D.Mass.1988).

Congress has not defined by statute when administrative deportation proceedings "are pending," specifically here, when such proceedings are deemed to begin. Nor does the scant legislative history on the IMFA shed light on the issue.[25] Pursuant to his delegated powers under the statute,[26] however, the Attorney General has promulgated several regulations on the issue.

Prior to March 2, 1987, 8 CFR § 242.1(a) defined when deportation proceedings were deemed to begin as follows:

> Every proceeding to determine the deportability of an alien in the United States is commenced by the issuance and service of an order to show cause by the [Immigration and Naturalization] Service. . . .

This same version of the regulation had been in effect since 1956.[27]

Effective March 2, 1987, the Attorney General amended this regulation to read as follows in pertinent part:

> Every proceeding to determine the deportability of an alien in the United States is commenced by the filing of an

Order to Show Cause with the Office of the Immigration Judge. . . . [28]

Further, he added 8 CFR § 3.14(a), which provides in whole:

> Jurisdiction vests and proceedings before an Immigration Judge commence when a charging document is filed with the Office of the Immigration Judge except for bond proceedings as provided for in 8 CFR 3.18 and 242.2(b).[29]

Under 8 CFR § 3.13, a "charging document" is defined specifically to include an OSC. Under 8 CFR §§ 3.18 and 242.2(b) (now 242.2(d)),[30] an immigration judge may, prior to the filing of an OSC, review a custody and bond determination by the INS.

In making these changes, the Attorney General did not specify whether they should apply (1) to all proceedings, including to proceedings where the OSC was both served and filed before the effective date of the changes; (2) to any proceeding where an OSC was not filed before that date, whether or not the OSC was served on the alien before that date; or (3) only to those proceedings where the OSC was both served and filed on or after that date.[31]

25. For this legislative history, see H.Rep. No. 99–906 (Sept. 26, 1986) (on H.R. 3737), *reprinted in part in* 1986 U.S.Code Cong. & Admin.News 5978–86; Sen.Rep. No. 99–491 (Sept. 26, 1986) (on S. 2270). A scan through the Congressional Record is similarly unrevealing of the slightest evidence on this issue.

26. *See* INA § 242(b), 8 U.S.C. § 1252(b). Under the INA, the Attorney General has statutory authority to promulgate regulations and has delegated much authority to the INS. *See Dong Sik Kwon v. INS*, 646 F.2d 909, 911 (5th Cir. May 1981) (en banc). *Compare* INA § 214(a), 8 U.S.C. § 1184(a) (the admission of a nonimmigrant alien "shall be for such time and under such conditions as the Attorney General may by regulations prescribe") *and id.* § 103(a), 8 U.S.C. § 1103(a) (directing the Attorney General to "establish such regulations; prescribe such forms . . .; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter") *with* 8 CFR §§ 2.1, 100.2(a), 100.6 (delegating authority to the Commissioner).

27. *See* 21 Fed.Reg. 97, 98 (Jan. 6, 1956).

28. *See* 52 Fed.Reg. 2931, 2937 (Jan. 29, 1987). Effective March 3, 1987, the Attorney General further amended 8 CFR § 242.1(a) in other re-

spects not applicable here. *See* 52 Fed.Reg. 3098, 3098 (Jan. 30, 1987) (eff. Jan. 30, 1987), *grammatical error in text not applicable here corrected*, 52 Fed.Reg. 5616, 5616 (Fed. 25, 1987), *effective date corrected*, 52 Fed.Reg. 6132, 6133 (Mar. 3, 1987) ("The effective date of the rule was incorrectly listed as January 30, 1987 instead of March 3, 1987."). Effective July 1, 1988, a clause not pertinent here was added to the end of the sentence quoted above. *See* 53 Fed.Reg. 24989, 24903 (June 30, 1988).

29. *See* 52 Fed.Reg. at 2937.

30. Subsection (b) of 8 CFR § 242.2 was later redesignated as subsection (c) and then as subsection (d). *See* 52 Fed.Reg. 16370, 16372 (May. 5, 1987) (redesignating subsection (b) as subsection (c)); 53 Fed.Reg. 9281, 9283 (Mar. 22, 1988) (redesignating new subsection (c) as subsection (d)). Perhaps by oversight, however, the citation in 8 CFR § 3.14(a) was not correspondingly changed.

31. For the sole published administrative history on these changes, see 52 Fed.Reg. at 2931–36 (supplemental information to final rules); 50 Fed.Reg. 51693 (Dec. 19, 1985) (proposed rulemaking).

On August 10, 1988, the Attorney General promulgated regulations specifically concerning the IMFA; [32] one such regulation, 8 CFR § 204.1(a)(2)(iii), provides:

The Service may not approve a visa petition filed on behalf of an alien by a United States citizen or lawful permanent resident spouse, which is based upon a marriage occurring after November 10, 1986 and while the alien is in either exclusion or deportation proceedings, or judicial proceedings relating thereto, until the alien has resided outside the United States for two years after the date of the marriage. *The period during which the alien is in such proceedings commences with the issuance of the Order to Show Cause (Form I-221) ...* and terminates when the alien departs from the United States while an order of deportation is outstanding or before the expiration of the voluntary departure time granted in connection with an alternate order of deportation under 8 CFR 243.5, or pursuant to an order of exclusion, or when the alien is found not to be excludable or deportable from the United States, or if the order to show cause ... is cancelled by the district director or terminated by the immigration judge, Board of Immigration Appeals, or Federal court on judicial review. Any petition filed during this period shall be denied without prejudice to the filing of a new petition once the beneficiary has resided outside the United States for the required period of two years following the marriage. Furthermore, any such denial shall be without prejudice to the reopening of petition proceedings should the beneficiary be found not deportable or excludable from the United States, or if the order to show cause or

notice of hearing is cancelled by the district director or terminated by immigration judge, Board of Immigration Appeals or Federal court on judicial review. The beneficiary shall not be accorded a filing date within the meaning of section 203(c) of the Act [8 U.S.C. § 1153(c)] based upon any spousal petition within the prohibited period. [33]

Notwithstanding 8 CFR §§ 3.14 and 242.-1(a), this regulation provides that the 2-year delay period under the IMFA "commences with the issuance of the Order to Show Cause (Form I-221)." [34]

A petition approved under § 1154(b) for an alien's immediate relative status may be revoked. 8 U.S.C. § 1155 provides as follows:

The Attorney General may, at any time, for what he deems to be good and sufficient cause, revoke the approval of any petition approved by him under section 1154 of this title. Such revocation shall be effective as of the date of approval of any such petition. In no case, however, shall such revocation have effect unless there is mailed to the petitioner's last known address a notice of the revocation and unless notice of the revocation is communicated through the Secretary of State to the beneficiary of the petition before such beneficiary commences his journey to the United States. If notice of revocation is not so given, and the beneficiary applies for admission to the United States, his admissibility shall be determined in the manner provided for by sections 1225 and 1226 of this title.

On August 10, 1988, the Attorney General promulgated another regulation under the

---

**32.** *See* 53 Fed.Reg. 30011, 30015-23 (Aug. 10, 1988) (eff. Aug. 10, 1988).

**33.** *See id.* at 30016 (emphasis added).

**34.** To the same end as 8 CFR § 204.1(a)(2)(iii) is 8 § CFR 245.1(b)(14), which was also added on August 10, 1988:

The following categories of aliens are ineligible to apply for adjustment of status to permanent residence under section 245 of the Act [8 U.S.C. § 1255]:

(14) Any alien who seeks to adjust status based upon a marriage which occurred on or after November 10, 1986 and *after the issuance of an Order to Show Cause (Form I-221) issued pursuant to Part 242 of this chapter* ... unless he has resided outside the United States for two years following the marriage....

*See* 53 Fed.Reg. at 30022 (emphasis added).

IMFA, namely, 8 CFR § 205.1(a)(10), which provides:

> The approval of a petition made under section 204 of the Act [8 U.S.C. § 1154] and in accordance with Part 204 of this chapter is revoked as of the date of approval ... if any of the following circumstances occur before the beneficiary's journey to the United States commences or, if the beneficiary is an applicant for adjustment of status to that of a permanent resident, before the decision on his application becomes final:
>
> . . . .
>
> (a)(10) Upon a determination by the Service that it has approved a spousal immigrant visa petition based upon a marriage entered into while the beneficiary was under exclusion or deportation proceedings, or judicial proceedings relating thereto, and prior to the beneficiary's having resided outside the United States for at least two years in accordance with section 204(h) of the Act [8 U.S.C. § 1154(h)].

Unlike 8 CFR § 205.2 (which governs revocations on any ground other than those specified in § 205.1), § 205.1 gives a petitioner neither the right to an administrative appeal [35] nor "an opportunity to offer evidence in support of the petition and in opposition to the grounds alleged for revocation of the approval."

**B.**

The main dispute between the parties on the first claim is whether deportation proceedings were pending against Mr. Uzuegbu at the time he and his wife married on April 3, 1987. If they were not, then, as all properly agree, this Court should hold that the defendant abused his discretion under 8 CFR § 205.1(a)(10) in revoking the prior approval of Mrs. Uzuegbu's petition for

immediate relative status for her husband.[36]

The government contends that the applicable date for determining when Mr. Uzuegbu's deportation proceedings began for the purposes of the IMFA is October 18, 1985, the date the original OSC was issued and served on Mr. Uzuegbu. The Uzuegbus contend that the applicable date is the apparently now-undeterminable date that the original OSC was filed with the Office of the Immigration Judge.

**1.**

■ The government argues that the result is the same under either the date the OSC was issued and served on the one hand or the date it was filed on the other. In other words, the government argues that the OSC in this case was not only issued and served but also filed before the Uzuegbus married. Thus, the government suggests that the Court need not determine which of the two dates governs. The Court disagrees.

Because the Oakdale Office of the Immigration Judge first set a deportation hearing date on May 5, 1987 and an immigration judge held the first deportation hearing on May 15, 1987, one may reasonably infer that at some time on or before May 5, 1987 the Office of the Immigration Judge received at least a copy of the OSC. But because both the date the hearing was set and the date the hearing was held occurred *after* the date the Uzuegbus married, one cannot likewise infer from this evidence alone that the date the Office of the Immigration Judge received at least a copy of the OSC was *before* the date the Uzuegbus married. Nor does the INS attorney's memorandum to an immigration judge in Atlanta [37] create a genuine dispute on this issue, for the memorandum likewise does not indicate the date when either the original or a copy of the OSC (or the memoran-

---

**35.** While 8 CFR § 3.1(b)(5) provides for appellate review by the BIA for certain decisions revoking approval of such petitions, such review is limited "as provided in" 8 CFR pt. 205.

**36.** *Cf. Anetekhai*, 876 F.2d at 1223 (citing *Escobar*, 700 F.Supp. at 613) (the process due to a petitioner and alien spouse entitles them to show that they "had married before the INS initiated proceedings against" the alien).

**37.** The Court presumes, without deciding, that an appropriate immigration judge to receive the OSC issued by the defendant in Louisiana included one in Atlanta. *But cf.* 8 CFR § 3.11 (promulgated in Jan. 1987).

dum itself) was first filed with, that is, "actually received by,"[38] any immigration judge; because of the unexplained 18–month span between the date on the memorandum and the date a hearing was first set, the Court cannot presume, without more, that usual procedures (whereby an immigration judge sets and holds a deportation hearing soon after he receives the OSC) were followed in this instance. In sum, there is no evidence in the record from which a factfinder could reasonably infer the date on which the OSC was filed with the Office of the Immigration Judge. Further, with the Oakdale fire that destroyed many of the INS records, this date may never be determinable.

Under *Celotex Corp. v. Catrett*,[39] if a party bears the burden of proof on an issue at trial, then in order to defeat a second party's summary judgment motion against it on that issue, the first party cannot rely on its allegations in the pleadings but instead must present affirmative evidence that, at the minimum, a genuine dispute exists on that issue. Because both the government and the Uzuegbus have brought cross-motions for summary judgment on this timing issue and because neither of them has presented sufficient evidence from which a factfinder could reasonably conclude whether the OSC was filed before or after the Uzuegbus married on April 3, 1987, the Court must determine who bears the burden of proof on this timing issue. That is, the Court must determine whether the government must prove that deportation proceedings were pending at the time of the marriage or instead whether the plaintiffs must prove that deportation proceedings were not pending at the time of their marriage. Whoever bears the burden loses in this instance.

Evidence on this timing question lies largely, and at times exclusively, with the INS, which keeps custody of the official records for deportation proceedings.[40] Under no circumstances the Court envisions would plaintiffs such as the Uzuegbus have exclusive custody, control, or access to any evidence that might relate to this timing issue. In other words, both the duty in law to keep the records and the ability in practice to produce the proof on this issue lie with the government. Further, the sole persons who arguably could provide competent testimonial evidence on this issue are persons employed by the INS, that is, some INS attorney or other official who files OSCs or some immigration judge or other official who receives OSCs. Thus, the Court concludes that the government should bear the burden to show that Mr. Uzuegbu came within the scope of the IMFA, that is, that his deportation proceedings had been pending against him within the meaning of 8 U.S.C. §§ 1154(h) and 1255(e)(2) when he and his wife married.

Because the government has presented no evidence of a genuine dispute on this timing issue and because the government bears the burden of proof on this issue, the Court must construe the issue against the government. Specifically, for these summary judgment motions, the Court must presume that the date on which the OSC was first filed with the Office of the Immigration Judge occurred after the date on which the Uzuegbus married.

Contrary to the government's suggestion, then, the Court must resolve the parties' dispute whether the applicable date for determining when Mr. Uzuegbu's deportation proceedings began for the purposes of the IMFA is the date the original OSC was issued and served on Mr. Uzuegbu or instead the date the original OSC was filed with the Office of the Immigration Judge. In other words, the Court must determine whether the dispute, or rather here indeterminability, about the date the OSC was filed is a material one. Below, the Court determines it is.

**38.** *See* 8 CFR § 3.13 (defining "filing") (promulgated in Jan. 1987).

**39.** 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**40.** *See* INA § 103(a), 8 U.S.C. § 1103(a); 8 CFR § 103.7(d)(2).

2.

In support of its position that Mr. Uzuegbu's deportation proceedings began on the earlier date when the OSC was issued and served, the government cites a single sentence from an interim decision by the Board of Immigration Appeals (BIA) in *Matter of Enriquez.*[41]

*Enriquez* does not apply here. By February 1986, the OSC in *Enriquez* had been issued, served, and filed and an adverse deportation order had been made and become final. The alien was granted the privilege of voluntary departure by September 1986. The alien did not voluntarily depart, and in March 1987 he married a U.S. citizen. The alien moved to reopen on the basis of the marriage; the immigration judge denied the motion, and the BIA affirmed. On appeal before the BIA, the alien argued that deportation proceedings were no longer pending against him within the meaning of §§ 1154(h) and 1255(e)(2) because the administrative order of deportability had become final before the marriage was entered into. Disagreeing, the BIA held that proceedings remained "pending" at the time of the marriage because the alien's departure under the deportation order was not yet made effective; the BIA wrote:

> The administrative proceedings in this case commenced with the issuance and service of the Order to Show Cause. *Matter of Ramizez–Sanchez* ... (BIA 1980). As of March 2, 1987, however, proceedings are commenced by filing the Order to Show Cause at the Office of the Immigration Judge. 8 C.F.R. § 3.14(a) (1987). The immigration judge's subse-

quent deportation "order" became administratively final on February 13, 1986, when the respondent waived his right to appeal. *Matter of Lok* ... (BIA 1981). The deportation "proceedings," however, were still pending when the respondent married a United States citizen on March 15, 1987, because the proceedings had not been processed to a final conclusion at that point by the respondent's departure. *Matter of Chamizo* ... (BIA 1969).[42]

In *Enriquez*, the dispute was not when proceedings began but rather when they ended, and it was undisputed that the marriage occurred after not only the date the OSC was issued and served but also the later date it was filed. Thus, the BIA's passing reference to the date those proceedings began is dictum inapplicable to this case. The dictum does not purport to address the issue before this Court: whether the pre-March 2, 1987 or the post-March 2, 1987 version of 8 CFR § 242.1(a) applies in cases where the OSC was issued and served before that date but is filed, or is presumed to have been filed, after that date.[43]

■ The parties have cited, and the Court has found, no other administrative or judicial opinion that addresses this change in the INS regulations. The BIA has determined, however, that the scope of the IMFA should be construed narrowly in favor of the alien on the issue of "pending" proceedings where as here there is no question of a fraudulent marriage.[44] Because there are no "compelling indications that the Board's interpretation is wrong," this Court must accord deference to that inter-

---

**41.** Interim Decision No. 3045, 1988 BIA LEXIS 5 (BIA 1988).

**42.** *Id.* at 4; *accord Minatsis,* 713 F.Supp. at 1062.

**43.** In its earlier interim decision *Matter of Egbunine,* Interim Decision No. 3034, 1987 BIA LEXIS 11 (BIA 1987), cited by the BIA in *Enriquez,* the BIA appeared to recognize this potential issue. As in *Enriquez,* the OSC at issue had been both served and filed before the alien married and before the March 1987 amendments to 8 CFR § 242.1(a) (differing from *Enri-*

*quez,* this couple married during the course of the deportation hearings). Again, the issue was whether the marriage came within the time period set forth in 8 U.S.C. § 1255(e)(2). The BIA wrote: *"At a minimum,* administrative proceedings begin with the filing of an Order to Show Cause with the Office of the Immigration Judge." *Id.* at 3 (emphasis added).

**44.** *See Matter of Oduro,* Decision at 4 (BIA Feb. 23, 1988), *reprinted as* Exhibit 2 to Plaintiffs' Memorandum in Opinion to Defendant's Motion for Summary Judgment.

pretation.[45] This deference is particularly compelling here, where the time periods for commencing proceedings are established by the Attorney General through his rulemaking power rather than by Congress.[46]

■ Notwithstanding the BIA's apparent policy to construe reasonable disputes of law on 8 U.S.C. § 1154(h) in the alien's favor and the Attorney General's regulation that an INS district director among others is bound by the BIA's precedents,[47] the defendant now effectively contends that 8 CFR §§ 3.14(a) and 242.1(a) as amended apply at the most only where an OSC is both served and filed on or after March 2, 1987. In the absence of any published position by the Attorney General, the Commissioner of Immigration and Naturalization, the EOIR, or the BIA, the Court finds no basis to defer to the defendant's litigating position.[48]

Because presumably no OSC had been filed against Mr. Uzuegbu in March 1987 (when these two regulations became effective), application of these two regulations to the Uzuegbus' case does not constitute a retroactive application of the two regulations.[49] A law or regulation is not retroactive merely because it alters existing classifications or draws upon antecedent facts for its operation.[50] These two regulations do not state or suggest that they are to apply only in instances where the OSC was *issued* after the regulations' effective date; the Court is not inclined, or at liberty, to impose this additional element, where the Attorney General himself chose not to.

■ In sum, the Court holds that 8 CFR §§ 3.14(a) and 242.1(a) as amended apply to the Uzuegbus' case. In other words, the Court holds that, for purposes of 8 U.S.C. § 1154(h), Mr. Uzuegbus' deportation proceeding did not commence until the OSC was filed with the Office of the Immigration Judge. Because that filing date presumably occurred after the Uzuegbus married, the defendant erred as a matter of law in finding that the Uzuegbus' marriage came within the scope of 8 U.S.C. § 1154(h).

3.

■ The government also argues that the specific provisions of 8 CFR § 204.1(a)(2)(iii) should control over the more general provisions in 8 CFR §§ 3.14(a) and 242.1(a).[51] The government overlooks that 8 CFR § 204.1(a)(2)(iii) was not promulgated until August 1988, which is well over a year after the Uzuegbus married, almost 11 months after Mrs. Uzuegbu filed the visa petition on behalf of her husband, and almost 9 months after the INS approved the petition.

"It is a fundamental principle of jurisprudence that retroactive application of new laws is usually unfair."[52] One such instance of unfairness would occur in this case. Had the Uzuegbus clear notice at the time they chose to marry that the INS would apply 8 U.S.C. § 1154(h) against them merely because an OSC had already been issued to Mr. Uzuegbu, the Uzuegbus could have exercised an informed, rational choice whether to undertake additional

45. *Liwanag v. INS*, 872 F.2d 685, 688 (5th Cir. 1989) (following *Campos–Guardado v. INS*, 809 F.2d 285, 289 (5th Cir.), *reh'g en banc denied mem.*, 814 F.2d 658 (5th Cir.), *cert. denied*, 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987)), *reh'g en banc denied mem.*, 878 F.2d 1435 (5th Cir.1989).

46. *See Mehta v. INS*, 574 F.2d 701, 705 (2d Cir.1978); *cf. Cooper v. Lewis*, 644 F.2d 1077, 1084 (5th Cir. Unit A 1981).

47. *See* 8 CFR § 3.2(g).

48. *See Bowen v. Georgetown University Hospital*, 488 U.S. 204, 211–14, 109 S.Ct. 468, 473–74, 102 L.Ed.2d 493 (1988).

49. The government cannot complain about any retroactivity of a regulation that benefits a person, at least where there are no direct adverse consequences to another person from that benefit. *See* 2 Sutherland, *Statutes and Statutory Construction* § 41.03, at 345 (D. Sands rev. 4th ed. 1986).

50. *Environmental Protection Agency v. NOPSI*, 826 F.2d 361, 365 (5th Cir.1987).

51. *See, e.g., Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987).

52. Sutherland, *supra* note 49, § 41.02, at 340.

steps to avoid the harsh effect of the INS's interpretation of § 1154(h): Mr. Uzuegbus could have voluntarily departed and thus avoided an order of deportation, the couple could have then married, Mrs. Uzuegbu could have then filed an immediate relative petition for her husband, and then Mr. Uzuegbu could have applied for reentry into the United States as a permanent resident alien under immediate relative status. With no indication that the defendant would take his present position, the Uzuegbus had little reason to consider these undeniably more burdensome steps for effecting a marriage free of worries of possible government intrusion.[53]

Before 8 CFR § 204.1(a)(2)(iii) was promulgated, the sole regulations addressing when a deportation proceeding is deemed to begin were those in 8 CFR §§ 3.14(a) and 242.1(a). By its terms, 8 CFR § 242.1(a), both before and after its March 1987 amendment, applied (with one exception added in June 1988 and not applicable here)[54] to "[e]very proceeding to determine the deportability of an alien in the United States." Absent any regulation specifically addressing the IMFA, then, 8 CFR § 242.1(a) applies for all purposes, including for the purposes of the IMFA.

■ Under general rules of statutory construction, a substantive, noncurative, adverse change in administrative rules is not to be applied retroactively unless the language of both the administrative rule and the statute authorizing the rule requires such a result.[55] The Court finds that 8 CFR § 204.1(a)(2)(iii) constituted just such a change. First, by providing that, for the purposes of the IMFA, a deportation proceeding is considered to begin not when an OSC is filed but earlier when it is issued, the terms in 8 CFR § 204.1(a)(2)(iii) constitute a substantive change in the Attorney General's regulations under 8 U.S.C. § 1154(h) and 1255(e)(2).[56] Second, there is no suggestion that the change was curative as that term of art is understood, that is, that 8 CFR § 204.1(a)(2)(iii) was promulgated to correct some perceived erroneous judicial interpretation on when such proceedings first begin. Third, the change is unquestionably adverse to couples such as the Uzuegbus, without direct benefit to any other persons. Fourth, the Attorney General made no such express or even implied provisions that the changes from 8 CFR § 204.1(a)(2)(iii) should apply to cases where as here the alien and citizen married, the citizen filed a visa petition for the alien spouse, and the INS approved the petition all before the Attorney General promulgated 8 CFR § 204.1(a)(2)(iii).

In sum, the provisions in 8 CFR § 204.1(a)(2)(iii) on the commencement of deportation proceedings for the purposes of 8 U.S.C. § 1154(h) should not be applied against the Uzuegbus. Thus, the Court holds that the defendant abused his discretion in revoking, on the basis of 8 U.S.C. § 1154(h), the approval of Mrs. Uzuegbu's petition.

As Justice Holmes wrote: "Men must turn square corners when they deal with the Government."[57] If the government is to inspect beds, then the least it can do is not change the shape of a bed once a couple retires.

## IV.

■ In their second claim, the Uzuegbus seek to have this Court compel the defen-

---

**53.** Contrast Alexander v. Robinson, 756 F.2d 1153, 1156 (5th Cir.1985) (regulations implementing a statute are generally not unfairly retroactive, where there is no suggestion that the persons affected would have modified their behavior had they received prior notice).

**54.** See note 28 above.

**55.** Compare Bowen, 488 U.S. at 207, 109 S.Ct. at 471 with Springdale Convalescent Center v. Mathews, 545 F.2d 943, 957 (5th Cir.1977) (principles for determining whether to apply newly acted legislation retroactively "hold true for ad-

ministrative regulations") (citing Greene v. United States, 376 U.S. 149, 160, 84 S.Ct. 615, 621–22, 11 L.Ed.2d 576 (1964); cf. Dong Sik Kwon v. INS, 646 F.2d 909, 917 (5th Cir.1981) (en banc).

**56.** The Court need not determine the effect of this change for cases where the OSC was issued, served, and filed after the date 8 CFR § 204.1(a)(2)(iii) was promulgated; whatever the effect, it does not apply in this case.

**57.** Rock Island, A. & L.R. Co. v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920).

dant to grant Mr. Uzuegbu employment authorization under 8 CFR § 274a.12(c)(13) pending the completion of the deportation proceedings against him.

The Attorney General has authorized INS district directors such as the defendant to "dispens[e] ... mercy"[58] in the form of employment authorizations for persons such as Mr. Uzuegbu under deportation proceedings. If, in previously withholding such mercy to Mr. Uzuegbu, the defendant relied on the erroneous presumption that the Uzuegbus' marriage came within the prescription under 8 U.S.C. § 1154(h), then he ought reconsider his position.[59] The Fifth Circuit's recent opinion in *Perales v. Casillas*,[60] however, bars this Court from requiring the defendant to be merciful.

In sum, the Court holds that it lacks the power to compel the defendant to grant Mr. Uzuegbu employment authorization pending the completion the deportation proceedings against Mr. Uzuegbu.

### V.

For these reasons, the Court shall herewith enter a judgment (1) declaring that the defendant's revocation of the approval of the petition for immediate relative status filed by plaintiff Anissa Rene Uzuegbu on behalf of plaintiff Boniface Mmuoemenam Uzuegbu is unlawful, null, and void; (2) directing that the defendant forthwith grant reinstatement of such approval; (3) permanently enjoining the defendant and his successors and designees from revoking such reinstatement on the basis of 8 U.S.C. § 1154(h);[61] and (4) dismissing with prejudice the plaintiffs' second claim.[62]

---

**58.** *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir.1990).

**59.** *Cf. Bolourchian v. INS*, 751 F.2d 979, 980 (9th Cir.1984) (per curiam).

**60.** 903 F.2d 1043 (5th Cir.1990) (2–1).

**61.** The Uzuegbus seek a further declaration that the defendant be permanently enjoined from revoking the immediate family status for any other reason as well. The Court refuses, for to do so would contravene the statutory provisions

under the IMFA that such status is conditional until two years after the alien may obtain status as a permanent resident alien. *See generally* 8 U.S.C. § 1186a.

**62.** Neither side has specifically addressed whether the Uzuegbus are entitled to attorney's fees or costs under the Equal Access to Justice Act, 28 U.S.C. § 2412. Thus, the Court likewise does not address the issue here.